728 A.2d 783

**RESIDENTIAL WARRANTY CORPORATION**

**v.**

**BANCROFT HOMES GREENSPRING VALLEY, INC., et al.**

**No. 1221, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

April 30, 1999.

David W. Erb (M. Albert Figinski and Saul, Ewing, Weinberg & Green, on brief), Baltimore, for Appellant.

Edward C. Bacon (McCarthy, Bacon & Costello, L.L.P., on brief), Lanham, for Appellee, Bancroft Homes.

James P. Ulwick (Geoffrey H. Genth and Kramon & Graham, P.A., on the brief), Baltimore, for Appellees, James and Terry Rubenstein.

Argued before DAVIS, SALMON and THIEME, JJ.

DAVIS, Judge.

In 1995, the Council of Unit Owners of the Club at McDonogh Township (the Council) sued ten defendants, including appellant Residential Warranty Corporation, Incorporated and appellees, Bancroft Homes of Greenspring Valley, Incorporated (BHGV), and James Rubenstein and Terry Meyerhoff Rubenstein (the Rubensteins). The Council filed a fifty-two-count amended complaint in the Circuit Court for Baltimore County alleging that, among others, appellees were responsible for a variety of design and construction defects created during and after the construction of the Council's condominium units. The amended complaint also claimed that appellant was similarly liable, pursuant to residential warranties it issued on individual condominium units. On October 2, 1996,

appellant filed an amended cross-claim [1] against the parties who developed and built the property at issue, appellees and Bancroft Homes, Incorporated (BHI), for fraudulent conveyance, concealment, and indemnification based on a breach of contract.[2]

Between October 15, 1996 and February 24, 1997, the circuit court (Byrnes, J.) held hearings on various motions and disposed of forty-five of the Council's counts, leaving seven counts for trial.[3] In addition, the court issued an order on February 27, 1997, severing appellant's cross-claims for indemnity from the Council's suit. The following day, the parties proposed on the record a $4,200,000 settlement, subject to final approval by the Council, in which $625,000 would be paid by appellant and $3,575,000 would be paid by the remaining defendants, appellees. After discussion of the settlement proposal, the Rubensteins made an oral motion for summary judgment with respect to the cross-claim filed against them personally by appellant. The court orally granted the Rubensteins' motion that day, February 28, 1997. Shortly thereafter, the parties completed the settlement and the remaining counts of the Council's amended complaint were dismissed.

Appellant, on March 7, 1997, filed a motion for the court to reconsider its grant of the Rubensteins' motion for summary judgment. On the same date, appellant also filed a second amended cross-claim that clarified its previous claims, separately alleged a piercing the corporate veil claim, and added a claim under the Consumer Protection Act. In response, the Rubensteins filed a motion to strike appellant's second amended cross-claim as untimely and prejudicial. The court held a

1. Appellant's original cross-claim was filed in September 1994.

2. The parties disputed whether appellant alleged a piercing the corporate veil count within the amended complaint.

3. Appellant's brief states that nine counts remained for trial. Appellee BHGV correctly points out, however, that two additional counts were dismissed via summary judgment on February 21, 1997.

hearing on May 22, 1997, during which it denied appellant's motion for reconsideration and granted BHGV's motion for summary judgment with respect to appellant's cross-claims and amended cross-claims.[4] Furthermore, the court granted appellees' motion to strike the second amended cross-claim because the claim did not add any new counts except for that relating to the Consumer Protection Act, which the court determined was inapplicable.

On April 14, 1998, the court denied BHI's motion for summary judgment, thereby allowing appellant to proceed with its indemnification claim against BHI. The court also entered final judgment on that date, thereby granting summary judgment to both the Rubensteins personally and to BHGV with respect to appellant's cross-claim and amended cross-claim. Appellant timely noted its appeal on May 11, 1998 and presents for our review the following questions that we rephrase:

I. Did the circuit court err by determining that the Rubensteins could not be jointly and severally liable with BHI on either the piercing the corporate veil or fraudulent conveyance theory and, therefore, granting summary judgment in favor of the Rubensteins?

II. Did the circuit err, because appellant was entitled to seek contractual indemnification from BHGV, by granting summary judgment to appellee BHGV?

III. Did the circuit court err by granting appellees' motion to strike appellant's second amended cross-claim?

The Rubensteins present an additional question for our consideration, which we restate for clarity:

IV. Did the circuit court correctly enter summary judgment in favor of appellees on all counts of the amended cross-claim because appellant did not prove the condition precedent that BHI failed to perform its obligations under the warranty agreements?

---

**4.** Unlike BHI, the court determined that BHGV was not contractually bound to indemnify appellant.

We answer appellant's questions in the negative and the Rubenstein's additional question in the negative. Consequently, we affirm the circuit court's judgment.

## FACTS

Dr. James Rubenstein was the president and sole shareholder of BHI, a real estate development company and umbrella organization for other entities.[5] Dr. Rubenstein was the sole shareholder and president of all affiliated Bancroft entities, with the exception of BHGV, for which he shared officer duties [6] with his wife, Terry, who also maintained ten percent of the company's stock. During each year from 1984–1987, appellant entered into one-year building agreements with BHI, providing it with limited warranty agreements on all dwellings constructed. In exchange for the warranties, BHI agreed to construct homes within appellant's warranty standards and approved building codes, to perform warranty repairs upon notice from the purchaser without appellant's intervention, and to indemnify appellant for all expenses incurred by appellant resulting from major structural defects occurring during the first two years of warranty coverage.

Appellees contracted to build The Club at McDonogh Township (Club), a condominium complex consisting of eight buildings, each with four stories and multiple residential units.[7] In accordance with the agreements between BHI and appellant,

---

**5.** Dr. Rubenstein also was president of the following: Bancroft Homes of Greenspring Valley, Inc., Bancroft Homes of Owings Mills, Inc., Bancroft Homes of Hunt Valley, Inc., Bancroft Homes of Potapsco Valley, Inc., Bancroft Homes of Jones Valley, Inc., and Bancroft Homes of Old Court, Inc.

**6.** Dr. Rubenstein's affidavit states that he and his wife were "stockholders and officers" during the construction at issue. Furthermore, a financial consultant's report observed that Dr. Rubenstein was a co-chief operating officer with his wife.

**7.** The contracts designated BHI as the developer of McDonogh Township, a project which included townhomes, apartments, and condominiums. Dr. Rubenstein, in his deposition, refers to BHI as performing managerial and supervisory activities for BHGV, which was a general contractor.

the sale of each condominium unit within the Club included a limited warranty. The first unit was sold on October 17, 1986, at which time the first warranty agreement for a Club unit went into effect. Meanwhile, just prior to the sale of the first unit, Elizabeth Hobby was hired by appellees and BHI as the director of architecture.

Beginning in late 1986 and continuing into 1987, when the buildings were at various stages of completion, appellees learned of problems with the stucco finish used on the buildings. This observation led to the discovery of more serious problems.[8] In February 1997, Hobby, along with the project superintendent, Drayton Harrison, and the sales representative for the stucco manufacturer, Bill Feiss, made inspections which revealed structural technique problems resulting from a lack of consistency in the job specifications. At a BHI meeting on April 2, 1987, Dan Calistrat, an employee of a structural engineering firm hired to review the architect's plans and existing buildings, reported on the Club's status. Notes from the meeting state the following:

> Structural problems can be corrected in new construction more easily but will be more difficult with existing structures. [Harrison] had his suspicions about the buildings being of sound construction from the [outset]. Upon Mr. Calistrat's review of the shop drawings ... it was discovered that there was no consistency in specifications and applications.

Furthermore, on May 1, 1987, Hobby conducted another field inspection, noting several defects, which was followed by a May 8, 1987 memorandum to Dr. Rubenstein encouraging "diligent bidding" to remedy the problems rather than "contin-

---

**8.** The minutes from a January 28, 1987 meeting about the Club refer to the condominiums' "stucco problem" and whether the three existing buildings would be redone with wood siding. In addition, the minutes indicate a difficulty with heating and air conditioning systems in the Club's garage townhouses. The stucco problem and more detailed solutions also were included in notes from the February 4, 1987 meeting.

ued downgrading of details which have been worked out to be the most price-effective remedy possible for a bad situation."

On June 25, 1987, appellees held "Progress Meeting # 6" to discuss the status of new construction and repairs on the Club. The minutes from that meeting include the concern that "[l]ack of attendance shows lack of concern, and even though to some this has become a laughing matter the progress meeting will continue with those ... who care to resolve the many (nightmares) on the construction of [the Club]." [9] Despite the ongoing discovery of structural defects throughout the summer of 1987, appellees and BHI continued with construction and sales of units at the Club. By the end of 1987, titles to units in each of the eight buildings had been sold, and completion of construction on the buildings hid many of the structural problems.

Construction loan proceeds from the Club and other Bancroft projects were deposited into a single Signet Bank account under the name of BHI. Similarly, all withdrawal requests relating to BHGV's loan for the Club's construction were disbursed by Signet into the BHI account. From 1986 to 1987, however, transfers totaling over $650,000 were transferred,[10] at the direction of either Dr. or Mrs. Rubenstein, from the BHI account into Dr. Rubenstein's personal account.[11] During his 1996 deposition, Dr. Rubenstein could not explain the reason for the transfers, even though he and his wife were the only people with authority to transfer the money.

---

**9.** Although Dr. Rubenstein did not attend the meeting, a copy of the minutes was forwarded to him.

**10.** The amount of money allegedly transferred varies from $650,000 to nearly one million dollars within the parties' arguments.

**11.** From November 14, 1986 to November 23, 1987, separate checks in the following amounts were written from BHI to Dr. Rubenstein, personally: $5,000, $25,000, $20,000, $15,000, $209,389.92, $208,335, $15,000, $11,389.25, $75,000, $12,000, $13,000, $12,000, $20,000, $11,000, $7,500, $3,000, $5,000, $2,000, and $15,000.

By 1988, following the transfer of BHI funds to Dr. Rubenstein, BHI was near insolvency. On February 24, 1988, William Wolf, chairman of the Council's Maintenance Committee, wrote a letter to appellant requesting a meeting regarding the extensive construction problems and warranty work which needed to be completed. The letter recognized the "questions among [Club] residents as to the financial condition of [BHI]," and warned that the residents would possibly look to appellant for performance of the repairs. In addition, on March 28, 1988, Baltimore County Attorney Arnold Jablon wrote BHI's general counsel, pointing out the residents' complaints and BHI's failure to demonstrate a good faith effort to remedy the problem. Jablon also observed BHI's financial problems, stating that, "[a]lthough the county certainly understands the financial reality of [BHI's] situation, the failure to comply with the orders issued by the County cannot be accepted."

In a letter to all Club unit owners, dated April 4, 1988, appellee BHGV admitted its financial difficulties and informed the owners that it would be laying off its construction staff indefinitely and closing the sales office. The following day, Signet Bank wrote BHGV a letter informing BHGV that it was in default on its obligations to Signet. After discovering that approximately three and one-half million dollars in construction loan proceeds were unaccounted for, Signet commenced foreclosure proceedings against BHGV.[12] Nevertheless, BHI continued to issue to Dr. Rubenstein checks indicating that they were for loan payments, even though Dr. Rubenstein could not recollect the amount of money BHI owed him.

On July 14, 1988, William Noonan, III, on behalf of appellant, wrote Dr. Rubenstein and advised him of the homeowners' multiple complaints. Noonan explained that no additional extensions for either repairs or work completion would be granted and that Dr. Rubenstein needed to submit a

---

**12.** The proceeding, brought through Signet's substitute trustee, was *Carrick v. Bancroft Homes of Greenspring Valley, Inc.*, Circuit Court for Baltimore City, No. 88 CSP 1554.

proposal for solving the problems. In correspondence to Noonan on November 11, 1988, Dr. Rubenstein stated that "[a]ll code violations and major exterior problems have either been repaired or are being actively worked on." On May 2, 1989, Dr. Rubenstein made a similar representation to the Baltimore County Department of Permits and Licenses, stating that of the 130 warranty complaints, only four had not received service.

Despite Dr. Rubenstein's representations, the 1991 report of a structural engineering firm, Donald Simmons Associates, hired by Club homeowners, concluded that substantial design defects existed but had been covered up during completion of the units. On June 17, 1992, a report of the Baltimore County Department of Permits and Licenses observed that structural damage represented a serious danger to the residents. Appellant, on October 9, 1992, included the following in correspondence with the Rubensteins:

Not only does it appear that the buildings do not meet the building code, but the buildings were not constructed in conformity with [appellant's] warranty standards and/or accepted industry standards.... It is the position of [appellant] that the agreement ... has been seriously violated by Bancroft Homes.... Therefore, [appellant] will hold Bancroft Homes responsible for any defects and claims which may ultimately be determined as being within the terms of the Limited Warranty Agreement.

Thereafter, the Club's homeowners filed suit and the litigation which is the basis of this appeal began.

## DISCUSSION

### I

Appellant first argues that the circuit court erred by determining that the Rubensteins could not be jointly and severally liable with BHI on either the piercing the corporate veil or fraudulent conveyance theory and by granting summary judgment in favor of appellee Rubensteins. Before addressing the merits of appellant's argument, we shall discuss briefly the

standard for review of the grant of a motion for summary judgment. A trial court, in deciding whether to grant a motion for summary judgment, is limited to ruling as a matter of law and does not resolve factual disputes. *See Sheets v. Brethren Mut. Ins. Co.*, 342 Md. 634, 638, 679 A.2d 540 (1996). A proper grant of summary judgment requires the court to determine that there is no genuine dispute of material fact and that one party is entitled to judgment as a matter of law. *See Ritter v. Ritter*, 114 Md.App. 99, 103, 689 A.2d 101 (citations omitted), *cert. denied*, 346 Md. 240, 695 A.2d 1229 (1997). In addition, the court must "view all facts, and the possible inferences from the facts, in the light most favorable to the party opposing the motion." *Id.* at 103–04, 689 A.2d 101. Thus, in reviewing a grant of summary judgment, we must determine whether the trial court was legally correct. *See Goodwich v. Sinai Hosp. of Baltimore, Inc.*, 343 Md. 185, 204, 680 A.2d 1067 (1996).

Appellant entered into its contractual agreement with BHI, not with either the Rubensteins or BHGV. Therefore, once the trial court severed appellant's indemnity claim against BHI from the suit filed by the Council, appellant's only means of recovery within the original suit was on the fraud-based cross-claims. The court explained during the May 22, 1997 hearing:

> I have already ruled in this case that the, for better or for worse, that the corporations were viable corporations. I'm not changing that. I'm not going to permit a piercing of the corporate veil under these circumstances.
>
> So I guess in essence what I'm doing is granting Mr. Rubenstein's motion to dismiss but denying it at this time insofar as the two corporations are concerned.

Later, the court clarified its intent:

> But under the pleadings as I have them here, there is not sufficient evidence that BHGV and/or the the [sic] [Rubensteins], and I quote, used the corporation for purposes of perpetrating a fraud upon the [p]laintiffs and [appellant].

. . .

The Rubensteins, which is what is alleged in this cross[-]claim, that they used the money to commit some fraud upon them, and I don't think there is sufficient evidence to find that. And the rest of it has to do with their failure to do what they promised in the agreement [with appellant].... I don't know whether they did that or not, but you certainly can go out and get them.

. . .

If BHI wants to bring in BHGV, let them, but your redress it seems to me is against BHI.

So that being said, ... I'm going to deny reconsideration as far as the Rubensteins are concerned....

. . .

Now, if you want to sue [BHI] for these other reasons, you go right ahead.

It is from this grant of summary judgment that appellant appeals.

## A

■ Appellant contends that the court was presented with ample evidence to raise a jury question for piercing the corporate veil. The standard for piercing the corporate veil is as follows:

[T]he most frequently enunciated rule in Maryland is that although the courts will, in a proper case, disregard the corporate entity and deal with substance rather than form, as though a corporation did not exist, [citation omitted], shareholders generally are not held individually liable for debts or obligations of a corporation except where it is necessary to prevent fraud or enforce a paramount equity.

*Bart Arconti & Sons, Inc. v. Ames–Ennis, Inc.*, 275 Md. 295, 310, 340 A.2d 225 (1975). Thus, a Maryland court may pierce

the corporate veil only based on fraud or proof that it is necessary to enforce a paramount equity.

■ The rule regarding paramount equities is that,
when substantial ownership of all the stock of a corporation in a single individual is combined with other factors clearly supporting disregard of the corporate fiction on grounds of fundamental equity and fairness, courts have experienced "little difficulty" and have shown no hesitancy in applying what is described as the "alter ego" or "instrumentality" theory in order to cast aside the corporate shield and to fasten liability on the individual stockholder.

*Travel Committee, Inc. v. Pan American World Airways, Inc.,* 91 Md.App. 123, 158–59, 603 A.2d 1301 (1992) (quoting *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.,* 540 F.2d 681, 685 (4th Cir.1976)). The factors used in analyzing whether a paramount equity should be enforced include, *inter alia,* "whether the corporation was grossly undercapitalized, ... the dominant stockholder's siphoning of corporate funds, ... the absence of corporate records, and the corporation's status as a facade for the stockholders' operations." *Id.* at 159, 603 A.2d 1301 (quoting *DeWitt,* 540 F.2d at 686–87).

Despite the proclamation that a court may pierce the corporate veil to enforce a paramount equity, arguments that have urged a piercing of the veil "for reasons other than fraud" have failed in Maryland courts. *See id.* at 156, 603 A.2d 1301. This Court observed that, "[n]otwithstanding its hint that enforcing a paramount equity might suffice as a reason for piercing the corporate veil, the Court of Appeals to date has not elaborated upon the meaning of this phrase or applied it in any case of which we are aware." *Id.* at 158, 603 A.2d 1301.[13]

---

13. *See also* G. Michael Epperson & Joan M. Canny, *The Capital Shareholder's Ultimate Calamity: Pierced Corporate Veils and Shareholder Liability in the District of Columbia, Maryland, and Virginia,* 37 Cath. U.L.Rev. 605, 621 (1988) (stating that Maryland courts "simply have not found an equitable interest more important than the state's interest in limited shareholder liability," and observing that "Maryland courts admit little of the discretion invoked by the courts of neighboring jurisdictions").

Appellant, however, argues that the factors necessary to pierce the corporate veil are demonstrated by the record. According to appellant, Dr. Rubenstein intentionally and secretly impoverished BHI while covering up multiple major structural flaws within the Club's units. The facts, alleges appellant, give rise to the inference that Dr. Rubenstein siphoned BHI's funds to prevent BHI both from making proper repairs required under the warranty agreement and from indemnifying appellant for the expenses it incurred due to BHI's failure to construct and repair the Club properly.

The Rubensteins, on the other hand, argue that they made substantial loans to the corporation and that BHI, in turn, routinely made distributions to them. The couple calls it "unremarkable" that Dr. Rubenstein lacks specific recollection of nearly one million dollars in transactions between him and BHI from 1986 to 1988 and asserts that the facts do not rise to the level of fraud. The Rubensteins also aver that BHI was a viable corporation with total sales over fifty million dollars, a large payroll, a number of substantial real estate projects, and hundreds or thousands of contracts with suppliers or customers during the time applicable to this appeal. Essentially, the Rubensteins argue that appellant was unable to meet its burden of presenting clear and convincing evidence, *see Dixon v. Process Corp.*, 38 Md.App. 644, 656, 382 A.2d 893 (1978), either that they perpetrated common law fraud or that appellant had been affected by the alleged fraudulent acts. According to the Rubensteins, they have met their obligations concerning the Club's construction via the settlement with the Council, and appellant may seek indemnity through its separate suit against BHI based on their contractual relationship.

Appellant relies heavily on a First Circuit case, *Crane v. Green & Freedman Baking Co.*, 134 F.3d 17 (1st Cir.1998), wherein a corporation that was required to make contributions to an employee health and insurance fund experienced financial problems and ceased making the contributions, instead transferring all remaining assets to a successor entity. The fund manager sued the corporation's two principals and, after

evidence was presented to a jury, the court entered judgment as a matter of law in favor of the defendants. *See id.* at 19.

On appeal, the First Circuit observed that the principal and his wife caused the corporation to issue checks to themselves and their relatives during a time in which the corporation was known to be failing and expected to default. *See id.* at 23. Furthermore, the court indicated that the principal first explained that the checks were repayments for an unrecorded loan before later stating that he actually could not remember the purpose of the payments. *See id.* at 24. Viewing the evidence in a light most favorable to the fund manager, the court determined that "the evidence was sufficient to support a jury determination that the [principals] had used corporate funds for personal purposes at times when they knew either that the company was inadequately capitalized to meet its obligations, or that, in fact, it had stopped doing so. . . ." *Id.* Thus, the First Circuit reversed the district court and remanded the case because the evidence was more than *de minimis* and a jury could have found that the principals acted fraudulently. *See id.* at 25.

Appellant also relies on a Fourth Circuit case, *Cancun Adventure Tours, Inc. v. Underwater Designer Co.*, 862 F.2d 1044 (4th Cir.1988), in which the court pierced the corporate veil because the defendant company's sole owner commingled personal and corporate assets, regularly diverted corporate assets, and used corporate funds to pay for non-corporate expenses. *See id.* at 1048. Although the court recognized that small companies often act informally, the defendant owner treated his corporate and personal affairs as though they were indistinguishable. *See id.* Thus, he "cannot complain when [the plaintiff], who was injured by his misrepresentations, seeks to do the same." *Id.*

Although these federal cases are persuasive authority and factually similar to the instant case, our discussion, *supra,* demonstrates that Maryland is more restrictive than other jurisdictions in allowing a plaintiff to pierce a corporation's veil. In *Bart Arconti & Sons, supra,* the two principals

caused loans to be made from the corporation to themselves and subsequently reduced their indebtedness by crediting the loans against apparent unpaid salaries that were due them. This and other actions of the principals, designed to evade legal obligations during the pendency of an action against the corporation, rendered the company nearly insolvent. The Court of Appeals, however, held that "the corporate entity [may not] be disregarded merely because it wished to prevent an 'evasion of legal obligations'—absent evidence of fraud or similar conduct." *Bart Arconti & Sons,* 275 Md. at 312, 340 A.2d 225.

In *Colandrea v. Colandrea,* 42 Md.App. 421, 401 A.2d 480 (1979), we pierced the corporate veil after the president and sole shareholder of the defendant company transferred the company's business to a newly created corporation and misrepresented in a stock redemption agreement and promissory notes that the debt would be paid to her former husband. We observed that normally our Court would not have interfered with the trial court's determination that there was no fraud or paramount equity; however, the reasons given by defendant for her actions were "so devoid of merit" that we concluded the trial judge was clearly erroneous. *See id.* at 429, 401 A.2d 480. Of paramount significance to our decision was the fact that the defendant caused the corporation to enter into a stock redemption agreement "with the deliberate intention and purpose of cheating and defrauding [the plaintiff], the other party to the contract." *Id.* at 432, 401 A.2d 480.

Despite the factually similar federal cases relied upon by appellant, equally analogous Maryland law supports our conclusion that the corporate veil should not be pierced under the evidence submitted by appellant. Thus, we agree with the Rubensteins' assertion, and the trial court's analysis, that appellant proffers mere speculation that the distributions either were fraudulent or left BHI grossly undercapitalized. The Court of Appeals opined that the "burden of proof is on the one charging fraud to establish by clear, specific acts, facts that in law constitute fraud." *Starfish Condominium Ass'n v.*

*Yorkridge Serv. Corp., Inc.,* 295 Md. 693, 714, 458 A.2d 805 (1983) (citations omitted). Without factual evidence to link the distributions to fraudulent actions, appellant is unable to generate a genuine dispute of material fact.[14] *See Starfish,* 295 Md. at 714–20, 458 A.2d 805; *Dixon,* 38 Md.App. at 655, 382 A.2d 893. Although cases that raise issues of fraud generally are not suited for summary judgment due to the need for factual development, "when there is no genuine issue of material fact, summary judgment my be appropriate." *Berkey v. Delia,* 287 Md. 302, 306, 413 A.2d 170 (1980) (quoting Christopher Brown, *Summary Judgment in Maryland,* 38 Md. L.Rev. 188, 220–21 (1978)). Appellant, however, may continue to pursue indemnification from BHI, in a separate suit, based on their contractual relationship.

**B**

Appellant also argues that the trial court erred by denying it the opportunity to demonstrate at trial that BHI's assets had been fraudulently transferred to the Rubensteins. Appellant correctly observes that our conclusion that BHI is a valid corporation does not prejudice appellant's claim that assets from BHI were fraudulently transferred to the Rubensteins. *See Bart Arconti & Sons,* 275 Md. at 313, 340 A.2d 225. The issue raised by appellant, however, is whether the court properly granted summary judgment to the Rubensteins, not whether appellant has a viable claim against BHI for fraudulent conveyance.[15]

---

**14.** Appellant emphasizes, in its reply brief, that the record does not support the Rubensteins' explanation that the various checks deposited into their account were routine distributions of profits. The only evidence, however, supporting appellant's submission that the checks were diverted construction loan proceeds is that the checks written to Dr. Rubenstein often were made close in time to Signet's deposit of loan proceeds into BHI's account. This does not rise to the level of clear and convincing evidence.

**15.** On May 22, 1997, the trial court granted appellees' motion to strike the second amended cross-claim. As we shall discuss, *infra,* the court's decision was proper. Consequently, the first amended cross-claim is before us for consideration.

■ Appellant's claim for fraudulent conveyance, from Count IV of the amended cross-claim, alleges in relevant part:

38. Bancroft made these transfers without fair consideration.

39. These transfers impaired Bancroft's ability to perform its contractual obligations to [appellant].

40. Bancroft, at the time it made these transfers, believed that it would incur obligations to [appellant] and others beyond its ability to pay as the obligations matured.

41. Bancroft made these transfers with the intent to hinder, delay or defraud [appellant] and other Bancroft creditors and to remove these assets from the reach of [appellant].

42. Should [appellant] ultimately be held liable for the costs of repairs that should have been performed by Bancroft, then [appellant's] indemnification claims against Bancroft will mature.

WHEREFORE, [appellant] demands (1) that the transfers be set aside to the extent necessary for Bancroft to satisfy the claims made by [appellant], (2) that the [c]ourt enter an order levying or garnishing any and all property that was transferred, and (3) that the [c]ourt grant such other and further relief as it deems appropriate under the circumstances.

Although this count is well-pled in that it includes relevant language from the fraudulent conveyances statute, codified at MD.CODE (1990 Repl.Vol., 1998 Supp.), COM. LAW II (C.L.) §§ 15–201 to 15–211, it improperly seeks relief from BHGV[16] rather than the Rubensteins. The pleading would not give us pause in light of appellant's allegation that BHI and BHGV were simply alter-egos of the Rubensteins except that appellant's demands in other counts of the amended cross-claim are made against the various appellees separately.

-----

16. At the beginning of appellant's October 2, 1996 amended cross-claim, appellant defines Bancroft Homes of Greenspring Valley, Inc. as "Bancroft." Thus, the references from the fraudulent conveyance count are to BHGV, rather than the Rubensteins or BHI.

During the May 22, 1997 hearing, the court held that, "under the pleadings as I have them here, there is not sufficient evidence that BHGV and/or the the [sic] [Rubensteins], and I quote, used the corporation for purposes of perpetrating a fraud upon the [p]laintiffs and [appellant]." The court's grant of summary judgment in favor of the Rubensteins on this count was proper because the claim was made against BHGV. Even if the second amended cross-claim, which added a specific count for fraudulent conveyance against the Rubensteins, was not stricken by the trial court, summary judgment in favor of the Rubensteins would have been proper.

■ Appellant asserts that transfers of BHI funds into the Rubensteins' personal accounts are fraudulent under C.L. § 15–209 (conveyance by insolvent), C.L. § 15–205 (conveyance by person in business), and C.L. § 15–206 (conveyance by person about to incur debts). We decline to address whether the conveyances were fraudulent under the statute because the Rubensteins and appellant do not have a creditor-debtor relationship as defined in C.L. § 15–201. A creditor is defined as "a person who has any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed, or contingent." C.L. § 15–201(d). While appellant may have a "claim" against BHI, it does not have one against the Rubensteins because the Rubensteins never could have anticipated that appellant would be a future creditor of them personally. *See generally Dixon v. Bennett*, 72 Md.App. 620, 531 A.2d 1318 (1987) (creditor-debtor relationship must exist for maintenance of a suit under the fraudulent conveyance statute), *cert. denied*, 311 Md. 557, 536 A.2d 664 (1988).

A creditor, whose claim has not matured at the time of the conveyance, may proceed "in a court of competent jurisdiction against any person against whom he could have proceeded had his claim matured." C.L. § 15–210(a). According to appellant, BHI's failure to repair structural damage which arose within the first two years established that appellant would be a future creditor of BHI. Without deciding the issue with respect to BHI, we conclude that the Rubensteins are not

people "against whom [appellant] could have proceeded." Furthermore, the Rubensteins are not liable to appellant under the statute because, as explained above, appellant is unable to prove that "the conveyance of which they complain was made with the intention and design to defraud [them], and this fraudulent purpose will not be presumed, but must be proved, with the burden resting upon [appellant]." *Neeb v. Atlantic Mill & Lumber Realty Co.*, 176 Md. 297, 306, 5 A.2d 283 (1939). Absent proof that the money transfers were made with the intent to defraud appellant, the trial court did not err in granting summary judgment to the Rubensteins.

## II

Appellant next contends that BHGV should be liable for indemnification, even though BHI executed the warranty agreements containing the indemnification provisions, because BHGV stood in the shoes of BHI and reaped the benefits of such agreements.[17] According to appellant, BHGV not only represented that it was the general contractor or builder, but also used appellant's warranty as a marketing tool to sell units at the Club. Furthermore, appellant alleges that summary judgment in favor of BHGV was improper because BHGV dealt directly with appellant concerning repairs to the Club under appellant's warranties as if BHGV was responsible for the repairs. Finally, appellant submits that BHGV fulfilled the repair obligations of the builder according to appellant's warranty.

Appellee BHGV, however, emphasizes that the warranty agreements were entered into by BHI and appellant and that

---

17. Citing "many of the same reasons" that the trial court allegedly erred in granting summary judgment to the Rubensteins, appellant also contends that the court erred by granting summary judgment to BHGV on the piercing the corporate veil count. Appellant submits that, because BHGV was a vehicle used by Dr. Rubenstein to perpetrate fraud, BHGV is directly implicated in the fraud and may be held liable. As we concluded, *supra*, appellant has not proven the elements necessary to pierce the corporate veil. Furthermore, the only evidence presented to the court was that BHI issued a check to BHGV for $5,000.

BHGV never agreed to be contractually obligated to the terms of the agreements. In addition, BHGV contends that appellant misinterprets BHGV's warranty obligations to the unit owners as being an acceptance of the terms and conditions of the warranty agreement between BHI and appellant. Although BHI could complain to BHGV if certain repairs were not performed under its duty as developer of the condominium project, BHGV alleges that appellant had no such right.

We begin by observing that the agreement executed is between BHI and appellant, not BHGV.[18] Furthermore, BHGV was not one of the Bancroft entities that declared, within the agreement, its indemnification for BHI with respect to the agreement's obligations and responsibilities. Appellant seeks indemnity from BHGV, however, because of BHGV's repairs to various units and the correspondences BHGV sent to appellant notifying it of progress on different units' repairs. We agree with appellee BHGV that these repairs were performed in accordance with the statutorily codified implied warranties from developer to owner rather than the conditions of the warranty agreements between BHI and appellant.

Maryland Code (1996 Repl.Vol., 1998 Supp.), REAL PROP. (R.P.) § 11–131, provides for implied warranties from the developer of a newly constructed dwelling unit to both the owner of the new unit and the council of unit owners. The warranty to individual owners is for one year and covers workmanship in the construction of walls, ceilings, floors, and heating and air conditioning systems. *See* R.P. § 11–131(b). The warranty to the council of unit owners applies to mechanical, electrical, and plumbing systems as well as to roofs, foundations, and external walls. *See* R.P. § 11–131(c). The repairs to which Dr. Rubenstein referred in his March 17, 1988 letter to unit owners, on behalf of BHGV, served as a reassurance that BHGV was taking the action required by the

---

**18.** The contract states, "[appellant] and [BHI], intending to be legally bound, in consideration of the mutual promises contained herein, convenant [sic] and agree as follows...."

State's implied warranties.[19] Thus, BHGV's performance of repairs does not warrant a finding that BHGV attempted to avail itself of the agreement between BHI and appellant. Nor did BHGV accept the agreement by its actions. Although a person cannot be held liable under a contract to which he was not a party, a person may become bound by the contract if he or she later accepts or adopts it. *See Snider Bros., Inc. v. Heft,* 271 Md. 409, 414, 317 A.2d 848 (1974). In *Snider,* relied upon by appellant, the Court of Appeals held that a woman expressly adopted an earlier contract to which she was not a party by agreeing, in a later contract, to be bound by the earlier contract if certain payments were not made. *See id.* Appellant also relies upon *Porter v. General Boiler Casing Co.,* 284 Md. 402, 396 A.2d 1090 (1979), wherein the Court of Appeals observed that a party's conduct sufficient to manifest acceptance of a contract binds the party to the contract even though the party only has notice of the terms. *See id.* at 411–12, 396 A.2d 1090.

These cases are distinguishable from the instant case because BHGV never expressly adopted or engaged in conduct manifesting acceptance of the agreement between BHI and appellant.[20] Absent evidence that BHGV unequivocally intended to be bound by a contract to which it was not a party, there was no evidence from which a jury reasonably could have found BHGV liable on the contract. Thus, the trial court

---

**19.** BHGV's intent to act according to the Maryland Code's warranties, rather than the agreement between BHI and appellant, is further evidenced by Dr. Rubenstein's May 2, 1989 letter to the Department of Permits and Licenses. The letter stated that BHGV "[had] every intention of performing in its responsibilities to its customers in accordance with the building codes of Baltimore County and with the warranty and condominium regulations of the State of Maryland."

**20.** As further support for our conclusion, we note that in its motion for reconsideration of the grant of summary judgment to the Rubensteins, appellant stated, "[appellant's] contract was with BHI; BHI was the registered builder; BHI was the entity that promised the purchasers that it would satisfy certain warranty obligations. . . . [Appellant] at least was a future creditor of BHI under the fraudulent conveyance statutes, because it would be BHI to which [appellant] would look to perform warranty obligations at the Club."

did not err by granting summary judgment to BHGV on appellant's indemnity claim.

### III

Appellant finally argues that the court erred by granting appellees' motion to strike appellant's second amended cross-claim. Briefly reviewing the procedural history, the court granted the Rubensteins' February 28, 1997 oral motion for summary judgment with respect to appellant's amended cross-claim. In granting the motion, the court stated that "this really ... is about contract claims, and in order to be consistent I'm going to rule that [BHI] is a viable corporation and that there is no personal liability on the part of the Rubensteins for this contractual obligation that BHI had with both [appellant] and the Rubensteins." Following the grant of summary judgment, the Rubensteins settled with the Council and the remaining counts of the complaint were dismissed prior to the scheduled trial date of March 3, 1997. On March 7, 1997, however, appellant filed a second amended cross-claim. Appellees filed motions to strike and, during the May 22, 1997 hearing, the trial judge stated:

> Well, what I'm not going to permit on the theory of equity is the filing of the second amended cross[-]claim in this case. You want to sue them, you sue them. So the motion to strike the second amended cross[-]claim I'm going to grant if for no other reason than on equitable grounds.

Consequently, appellant's second amended cross-claim was stricken.

Amendments to pleadings are allowed under Maryland Rule 2–341 "when justice so permits." MD. RULE 2–341(c) (1999). The Rule provides for the liberal allowance of amendments "in order to prevent the substantial justice of a cause from being defeated by formal slips or slight variances." *E.G. Rock, Inc. v. Danly,* 98 Md.App. 411, 428, 633 A.2d 485 (1993). An amendment that would result in prejudice to the opposing party, however, should not be allowed. *See id.* Furthermore, such a decision is within the sound discretion of

the trial court. *See Hartford Accident and Indem. Co. v. Scarlett Harbor Assocs. Ltd. Partnership,* 109 Md.App. 217, 248, 674 A.2d 106 (1996), *aff'd,* 346 Md. 122, 695 A.2d 153 (1997).

 During the extensive argument on May 22, 1997, the court stated:

> I'm going to grant the motion to dismiss the cross—the second amended cross claim. First of all, it doesn't add anything. Whatever you need you have in the amended cross claim. Secondly, I have already ruled in this case that the, for better or for worse, that the corporations were viable corporations. I'm not changing that. I'm not going to permit a piercing of the corporate veil under these circumstances.

The court, already having granted summary judgment to the Rubensteins, determined that they would have been prejudiced by the second amended cross-claim because part of the basis for the settlement with the Council was their release from further liability. Once appellant's motion for reconsideration of its grant of summary judgment was denied, it would have been improper for the court to consider the second amended cross-claim. The court established its decision on the merits of appellant's allegations, rather than on a slight variance in the pleadings for which an amendment would have been proper. After examining the facts, we cannot say that the court abused its discretion by granting the motion to strike.[21]

## IV

The Rubensteins submit for our consideration the issue of whether the circuit court correctly entered summary judgment in favor of appellees on all counts of the amended cross-claim, because appellant did not prove the condition precedent

---

21. As a result of our conclusion that the court did not abuse its discretion by striking the second amended cross-claim, we decline to discuss the merits of appellant's argument regarding its claim under the Consumer Protection Act.

that BHI failed to perform its warranty obligations under the warranty agreements. We agree with appellant that the trial court did not expressly determine this issue and that it is irrelevant to the current appeal. In fact, the court denied BHI's motion for summary judgment and appellant's case against BHI has been stayed pending the outcome of this appeal. Consequently, we disagree with the Rubensteins' contention that the trial court concluded that appellant did not prove that BHI failed to perform its warranty obligations.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**