**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

ARNOLD P. WHITMORE,
Plaintiff-Appellant,

v.

No. 99-1443

LA-VAN HAWKINS; LA-VAN HAWKINS
URBANCITYFOODS, LLC; LA-VAN
HAWKINS INNERCITYFOODS, LLC,
Defendants-Appellees.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Joseph H. Young, Senior District Judge.
(CA-97-1959-Y)

Argued: April 5, 2000

Decided: June 27, 2000

Before MOTZ and KING, Circuit Judges, and John C. GODBOLD,
Senior Circuit Judge of the United States Court of Appeals
for the Eleventh Circuit, sitting by designation.

_____

Affirmed in part, reversed in part, and remanded by unpublished opin-
ion. Senior Judge Godbold wrote the opinion, in which Judge Motz
and Judge King joined.

_____

**COUNSEL**

**ARGUED:** Squire Padgett, LAW OFFICE OF SQUIRE PADGETT,
Washington, D.C., for Appellant. Nathaniel Edmond Jones, Jr.,

JONES & ASSOCIATES, P.C., Baltimore, Maryland, for Appellees.
**ON BRIEF:** Isaac Joe, Jr., Baltimore, Maryland, for Appellant.
James H. Fields, JONES & ASSOCIATES, P.C., Baltimore, Maryland, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

GODBOLD, Senior Circuit Judge:

Arnold Whitmore is a fast food executive employed by La-Van Hawkins InnerCityFoods, L.L.C. (ICF) to serve as its Chief Operating Officer. Following his termination in 1996 Whitmore initiated this litigation against ICF, La-Van Hawkins, and La-Van Hawkins UrbanCityFoods, L.L.C. (UCF). Whitmore contended that Hawkins, ICF, and UCF were personally liable for breach of the employment agreement that he signed with ICF. He also alleged that he was entitled to receive the equitable value of the shares that he owned in ICF and UCF. The district court dismissed Hawkins and UCF pursuant to Rule 50 and determined that Whitmore was not entitled to the fair market value of his shares in either company. A jury found that ICF breached Whitmore's employment contract and awarded him $92,884.65 in back severance pay and a 5% equitable interest in ICF. Whitmore appealed the dismissal of UCF and Hawkins and the district court's finding that the operating agreement precluded him from receiving the equitable value of his shares in the two companies. We agree with the district court that UCF is not liable to Whitmore and that Whitmore is not entitled to receive the value of his equity interest in either ICF or UCF. We reverse the dismissal of Hawkins in his individual capacity and remand to the district court for further proceedings.

FACTS AND PROCEDURAL HISTORY

La-Van Hawkins is the President and CEO of ICF, a Maryland limited liability company. Prior to 1996 ICF owned and operated several

2

Checkers Drive-In Restaurant franchises. In the summer of 1995 Hawkins began negotiating with Burger King Corporation for the development of numerous Burger King restaurants in major inner city markets. Hawkins personally recruited the services of Arnold Whitmore, an experienced fast food executive, to manage the Checkers restaurants and serve on the future management team of a new entity (UCF) that would operate the Burger King Restaurants. In October of 1995 Whitmore agreed to serve as COO for ICF and entered into an employment contract (the employment contract). The initial paragraph of the employment contract states:

> This employment agreement is made and entered into .. . by and between La-Van Hawkins InnerCityFoods, a Maryland Limited Liability Company ("ICF") and Arnold Whitmore ("Whitmore"), a resident of Illinois, and La-Van Hawkins ("Hawkins"), a resident of the state of Maryland.

Although the employment contract states that it is"by and between" ICF, Whitmore, and Hawkins, the only signatories to the agreement were ICF and Whitmore. Hawkins signed the contract as the representative of ICF, but he did not sign the contract in his individual capacity, nor was there a signature line for him to sign in his individual capacity.

The employment contract gave Whitmore "a five percent (5%) equity interest ("Ownership Interest") in the Company that owns and operates the Checkers Restaurants or the company that will own and operate the BKC restaurants and other quick service food concepts." The ownership interest was to be "issued over a two year period at 2.5% each year at no cost to Whitmore." The employment contract also provided that Whitmore would receive twelve months base salary, $115,000, as a final cash settlement if he was terminated. At the time of his termination Whitmore's base salary was $115,000.

When Whitmore joined ICF all parties expected that Burger King would sign a franchise agreement allowing Hawkins to operate 125 Burger King franchises. After Whitmore signed the employment contract with ICF Hawkins obtained an agreement from Burger King to build 125 franchises in inner cities across America.

3

The agreement with Burger King necessitated the formation of a new company to operate the Burger King restaurants. In February of 1996 Hawkins, Whitmore, and three other executives formed UCF and signed the UCF operating agreement to operate the Burger King Restaurants. Whitmore paid $50 for a 5% Class B ownership interest in UCF.

Hawkins terminated Whitmore and another executive in May of 1996. The only restaurants in existence at the time of Whitmore's termination were the Checkers restaurants owned and operated by ICF. At the time of termination UCF owned no restaurants, had no assets, and conducted no business. Whitmore was tendered $22,115.35 as severance, an amount equal to two months of his $115,000 annual salary.

After Whitmore was terminated Hawkins sold some of his Checkers restaurants and transferred the remainder to UCF pursuant to his agreement with Burger King. The sale, which occurred in August of 1996, was allegedly worth between 10 and 40 million dollars.

Whitmore initiated this lawsuit and sought damages for the equity interest he had in both ICF and UCF and for the severance package as set forth in the employment contract. He named Hawkins, ICF, and UCF as separate defendants (collectively the "Hawkins defendants").

During discovery the district court denied Whitmore the financial records of ICF and UCF after concluding that Whitmore was not entitled to receive cash for his interest in ICF or UCF under the operating agreements of either company. After the close of discovery the district court denied the motion for summary judgment of Hawkins, ICF, and UCF. Six months after the close of discovery Whitmore moved to amend his complaint to include detrimental reliance claims. The district court denied the motion.[1]

_____

[1] We find no merit in Whitmore's contention that the district court abused its discretion when it refused to allow him to amend his complaint after the close of discovery. Whitmore admitted that he was aware of the additional defenses that warranted the amended claims months before he filed his motion to amend the claims. He elected not to file this motion because he was busy with other aspects of this case that he felt more compelling.

4

Prior to the start of the jury trial Hawkins filed a motion in limine to prevent Whitmore from presenting evidence or argument that Hawkins was personally liable under the employment contract. The motion was granted in open court and was reduced to a written order after the jury entered its verdict.

The case proceeded to a jury trial. The district court granted Hawkins' motion for judgment as a matter of law and dismissed him at the close of Whitmore's case-in-chief. At the close of all of the evidence the district court granted UCF's motion for judgment as a matter of law and dismissed UCF. The jury concluded that Whitmore's contract with ICF had been breached from which he was entitled to $92,884.65 and a 5% equitable interest in ICF.

Whitmore's contentions on appeal can be classified into three general categories: 1) Hawkins' personal liability and dismissal pursuant to FRCP Rule 50; 2) UCF's liability under the employment contract and dismissal pursuant to FRCP Rule 50; and 3) Whitmore's right to demand the equitable value of his shares in either ICF or UCF. Hawkins and UCF deny any liability to Whitmore under the Whitmore-ICF employment contract. The Hawkins defendants contend that language in the operating agreements of ICF and UCF prevent Whitmore from demanding the value of his shares in the companies.

We apply de novo review to appeals challenging the granting of a motion for judgment as a matter of law. The question is not whether there is no evidence but whether there is sufficient evidence upon which a jury properly can proceed to reach a verdict. On appeal, we must resolve direct factual conflicts in favor of the nonmovant, assume as true all facts supporting the nonmovant which the evidence tended to prove, and give the nonmovant the benefit of all reasonable inferences. In order to benefit from the favorable inferences available on a motion for judgment as a matter of law, a nonmovant must present substantial evidence. We must uphold the decision of the district court to withdraw the case from the jury if Whitmore failed to satisfy this minimal evidentiary standard. See Gairola v. Virginia Dep't of Gen. Servs., 753 F.2d 1281, 1285 (4th Cir. 1985).

HAWKINS

Whitmore contends that Hawkins should not have been dismissed from the case pursuant to Rule 50 because there was sufficient evi-

5

dence from which a reasonable juror could conclude that Hawkins intended to be personally liable under the employment contract. The parties do not dispute that the opening paragraph in the employment contract states that the contract was "by and between" Whitmore, ICF, and Hawkins. Nor do they dispute that there was no signature line for Hawkins to sign in his individual capacity or that he failed to sign in his individual capacity. Whitmore contends that these contradictory areas of the contract create an ambiguity. Therefore the court should look to other evidence which indicates that it was Hawkins' intent to be personally liable under the employment contract. Hawkins contends that Maryland law requires that his signature be given effect only in his representative capacity and that the statute of frauds mandates the affirmance of his dismissal.

In determining whether a contract is ambiguous Maryland adheres to the law of objective interpretation of contracts. Calomiris v. Woods, 727 A.2d 358, 363 (Md. Ct. App. 1999). Under the objective view, a written contract is "ambiguous" if, when read by a reasonably prudent person, it is susceptible of more than one meaning. Id. To determine if the contract is ambiguous we look to the purpose of the contract, the facts and circumstances of the parties at the time of execution, and the language used in the contract. Id. (citing State v. Attman/Glazer P.B. Co., 594 A.2d 138, 144 (Md. 1991)).

There exists an ambiguity in the employment contract because the first paragraph in the contract states that Hawkins was contracting in his individual capacity, but there was no signature line for Hawkins to sign in his individual capacity. The parties dispute whether we should give effect to the opening paragraph or the lack of a signature.

Because the contract is ambiguous we must look at the surrounding evidence to determine the intent of the parties. Whitmore proffered sufficient evidence to show that Hawkins intended to be bound in his individual capacity. The language in the opening paragraph stating that Hawkins was a party to the contract is strong evidence indicating Hawkins' intent. This evidence is further strengthened by the fact that Hawkins instructed the person who drafted the contract. A general rule of contract interpretation is that all ambiguities must be construed against the person responsible for drafting the contract. See King v. Bankerd, 492 A.2d 608, 612 (Md. 1985). Finally, there is evidence of

6

nearly identical contracts entered into by ICF and Hawkins with different employees that contained identical language in the opening paragraph where Hawkins did sign in his personal capacity. Under the standard of review for Rule 50 dismissals this evidence is consistent with Whitmore's contention that Hawkins intended to be personally liable.

Hawkins contends that the claim against him must fail even if the contract is ambiguous because the statute of frauds writing requirement was not met. Subsection 3 of Maryland's Statute of Frauds, Art. 39 § 1 comprises what is known as the one-year provision, encompassing those contracts that cannot possibly be completely performed within a year. Because this employment contract is undisputedly for two years, it would usually fall within the one year provision and would require Hawkins' signature to satisfy the writing requirement. See, e.g., Collection & Investigation Bureau of Md. v. Linsley, 375 A.2d 47 (Md. Ct. App. 1977); see also Griffith v. One Inv. Plaza Associates, 488 A.2d 182 (Md. Ct. App. 1985).

However, there is an exception under Maryland law through which Hawkins can be held liable because he signed the contract as the agent of ICF. Under Maryland law a party can be bound to a contract that it did not sign when the evidence unequivocally indicates that the non-signatory intended to be bound by the contract. See Residential Warranty Corp. v. Bancroft Homes Greenspring Valley, Inc., 728 A.2d 783, 784 (Md. Ct. App.), cert. denied, 735 A.2d 1107 (Md. 1999); see also Porter v. General Boiler Casing Co., 396 A.2d 1090, 1095 (Md. 1979) (indicating that a non-signatory can be bound by a contract because of his actions even when he does not sign the contract).

> In order for the acts of one party to transcend the bar of the Statute of Frauds, those acts generally must be of such character that the court shall, by reason of the act itself, without knowing whether there was an agreement or not, find the parties unequivocally in a position different from that which, according to their legal rights, they would be in if there were no contract.

Mann v. White Marsh Properties, Inc., 581 A.2d 819, 821 (Md. 1990) (citations omitted). Whitmore's proferred evidence met this burden.

7

Hawkins relies on Curtis G. Testerman Co. v. Buck, 667 A.2d 649 (Md. 1995), for the proposition that contractual stipulations solely bind the principal when a party acts as the agent of another. In Testerman the contract identified the corporation in the heading and signature page and the parties "were well aware" that Mr. Testerman was acting as the agent for Curtis Testerman Company. Testerman is distinguishable from the present case because the opening paragraph directly contradicts the signature page; in Testerman there was no opening paragraph naming Mr. Testerman as a principal in his individual capacity. A corporate official signing a contract in his official capacity may be held liable in his individual capacity if the other party is not aware that he is signing only in his official capacity.

Hawkins' failure to sign the contract is not dispositive of this issue. See Continental Cablevision of New England, Inc. v. United Broadcasting Co., 873 F.2d 717, 721 (4th Cir. 1989). Under Maryland law

> [whether] an officer of a corporation, signing an agreement, means to bind himself personally, must, as a general rule, be determined by the face of the paper itself; but where there is such ambiguity on the face of the paper as to be consistent with either construction, whether one means to bind himself personally, or acts in an official capacity, parol evidence is clearly admissible to prove the circumstances under which the contract was made, or, in other words, to prove the true nature of the transaction.

Morrison v. Baechtold, 48 A. 926, 929 (Md. 1901) (citations omitted). Therefore extrinsic evidence should have been submitted to the jury to determine whether Hawkins intended to be bound.

When a court determines that an ambiguity exists the fact finder may use extrinsic evidence that is consistent with the plain language in the contract to resolve the ambiguity. See Admiral Builders Sav. & Loan Ass'n v. South River Landing, Inc., 502 A.2d 1096, 1100 (Md. Ct. App. 1986). The facts taken in the light most favorable to Whitmore indicate that Hawkins intended to be personally liable.

A jury has not yet heard any evidence of Hawkins' personal liability under the employment contract because this evidence was

8

excluded in a pre-trial motion. The district court dismissed Hawkins pursuant to Rule 50 at the close of Whitmore's presentation of evidence. In doing so the district court did not recognize the ambiguity created by the opening paragraph of the contract and the facts that tended to support Whitmore's contention. A jury should hear the evidence surrounding Hawkins' personal liability to determine if Whitmore was aware that Hawkins was acting only in his official capacity when he signed the employment contract. We reverse Hawkins dismissal from the case and remand this issue to the district court.

UCF

Whitmore contends that UCF should not have been dismissed under FRCP Rule 50 because it shared liability under the employment contract. We conclude that Whitmore was the employee of ICF at all times and that the district court properly dismissed UCF.

There is no dispute that UCF did not execute the employment contract -- it had not yet been created. Whitmore contends that whether UCF was an intended third party beneficiary or successor party to the ICF employment contract was a question for the jury. He bases this contention on several clauses in the employment contract that mentioned the company that was to be formed to operate the Burger King franchises. Therefore it was reasonable to expect that UCF would ratify the employment contract once it came into corporate existence and Whitmore began serving as its Chief Operating Officer. See Porter, 396 A.2d at 1094.

However, Whitmore failed to proffer sufficient evidence to show that UCF took any action in furtherance of the employment contract: UCF never paid Whitmore any of the salary owed under the employment contract or paid him a bonus, never reimbursed Whitmore for any expenses, including business-related expenses, and never provided any of the fringe benefits set forth in the agreement. ICF performed all obligations set forth in the employment contract, paid his salary, and provided office space for Whitmore. UCF is not liable under the ICF contract because no rational trier of fact could conclude that UCF was a party to the employment contract or in any way ratified or adopted the employment contract. There was no error in the dismissal of UCF.

9

WHITMORE'S ENTITLEMENT TO SHARE VALUE

Whitmore's ownership interest in ICF and UCF requires some clar-
ification. Whitmore owns 5% of UCF and 5% of ICF. The employ-
ment contract with ICF clearly states that Whitmore was entitled to
a 5% share of ICF or the company created to own and operate the
Burger King stores at no cost to Whitmore.**2** The purchase of 5% of
UCF in February of 1996 required Whitmore to make an additional
$50 contribution. This 5% share is separate from the 5% share dis-
cussed in the employment contract as is evidenced by the $50 contri-
bution requirement and the fact that other executives who purchased
5% of UCF in February included executives not owed 5% under any
ICF employment contracts. The jury decided that Whitmore has an
additional 5% equity interest in ICF. Therefore, Whitmore owned 5%
of ICF pursuant to his employment contract and purchased an addi-
tional 5% of UCF in February of 1996.

Whitmore contends that the jury should have been allowed to
determine the value of Whitmore's 5% equity interest in the two com-
panies because the Maryland Limited Liability Company Act required
both UCF and ICF to dissolve or redeem his interest for its fair mar-
ket value after his withdrawal as a member. However, both ICF and
UCF adopted operating agreements that modified the Maryland LLC
Act and the default rules set forth in the LLC Act that are relied upon
by Whitmore. Therefore the operating agreements control whether
Whitmore is entitled to receive the value of his shares of the two com-
panies.

ICF SHARES

The district court ruled that the jury could not determine the value
of Whitmore's 5% equity interest in ICF because the operating agree-
ments prevented him from demanding the value of his interest. Whit-
more contends that the previous version of the Maryland LLC Act in
effect at the time required ICF to dissolve or redeem Whitmore's
interest for its fair market value after his withdrawal as a member. See
Md. Limited Liability Company Act, §4A-905. However, the ICF

_____

**2** The contract states: "This ownership interest shall be issued over a
two year period at 2.5% each year at not (sic) cost to Whitmore."

operating agreements changed the default rules set forth in the LLC Act. Therefore Whitmore's right to demand the equitable value of his shares is controlled by the ICF operating agreement on any provisions addressed in the operating agreement. See Md. Limited Liability Company Act, § 4A-402(a). The default rules do not apply in this case.

The ICF operating agreement requires Whitmore establish that he withdrew from the company before he can assert any right for the fair market value of his shares. The ICF operating agreement indicates that a member may withdraw only under limited circumstances. We are only concerned with the section addressing involuntary withdrawals.**3** Whitmore contends that his termination acted as an involuntary withdrawal. Section I of the operating agreement defines "Involuntary Withdrawal" as the occurrence of any one of eleven events, none of which occurred in this case.**4** Whitmore failed to present any evidence demonstrating that an involuntary withdrawal event occurred.

Even if one of the involuntary withdrawal events did apply to Whitmore he would still not be entitled to the liquidated value of his shares. Section 6.3 of the operating agreement states:

> 6.3 Involuntary Withdrawal. Immediately upon the occurrence of an Involuntary Withdrawal, the successor of the withdrawn Member shall thereupon become an interest holder but shall not become a member. If the Company is continued . . . the successor interest holder shall have all rights of an interest holder but shall not be entitled to receive in liquidation of the Interest pursuant to§ 4A-

_____

**3** Section 6.2 of the ICF operating agreement states that "No Member shall have the right to Voluntarily Withdraw from the Company." Whitmore makes no claims under this section.

**4** Involuntary withdrawals as defined in the ICF operating agreement include numerous bankruptcy and insolvency provisions (§ 6.2(i-vii)), death or adjudications of incompetency of the member (§ 6.2 (viii)), dissolution or commencement of winding up of the partnership or LLC if the member is a partnership or LLC (§ 6.2(x)), and distribution of the estate's entire interest in the company if the member is an estate (§ 6.2(xi)).

11

905((1)(ii)) of the Act, the fair market vale of the Member's Interest as of the date the Member involuntarily withdrew from the Company.

Record Excerpts at 1572 (emphasis added). Although the jury may have awarded Whitmore a 5% interest in ICF, he is not entitled to the fair market value of his equity interest.

UCF SHARES

Whitmore contends that he is entitled to the fair market value of his shares in UCF. This contention fails for similar reasons.

Whitmore must prove that he is a withdrawn member under the UCF operating agreement. Section 17.2 of the UCF operating agreement prevents a person with an ownership interest from voluntarily withdrawing from UCF without the approval of a majority of the Class A members. R. at 1598. Whitmore received no such approval. Therefore voluntarily withdrawal does not apply.

The UCF operating agreement also contained a section defining involuntary withdrawals. Id. at 1598-99. The definition of involuntary withdrawals under UCF's operating agreement differs from the ICF operating agreement because § 17.3.1(m) classifies termination from UCF as an event that satisfies the definition of involuntary withdrawal. Id. at 1599.**5**

Whitmore failed to present sufficient evidence that any of the involuntary withdrawal events occurred. Although Whitmore was terminated, he was never an employee of UCF. At all times during Whitmore's tenure with the Hawkins' defendants he was the employee of ICF. Because he failed to present sufficient evidence showing that he was an employee of UCF, he cannot rely on § 17.3.1(m). Therefore

_____

**5** The UCF operating agreement lists several grounds for involuntary withdrawal including several related to bankruptcy and receivership, death and adjudication of insanity, and other situations not relevant to the current case. Not until Whitmore's reply brief did he offer any suggestion that he relied on § 17.3.1(m) as the involuntary withdrawal event.

12

he failed to satisfy the UCF operating agreement definition for involuntary withdrawals.

Even if Whitmore was an employee of UCF he would still not be entitled to receive the equitable value of his interest. The UCF operating agreement does not require UCF to purchase the member's ownership or to receive the cash value of his ownership interest on his request interest, even those members who involuntarily withdraw. Whitmore has no right to require UCF to purchase his shares.

Because we find that the district court acted properly when it held that Whitmore was not entitled to the equitable value of his shares in either ICF or UCF, we find no merit in Whitmore's contention that the court abused its discretion when it prevented Whitmore from obtaining the financial records of ICF and UCF. We agree that the financial information and the value of the shares is not relevant to this case because the operating agreements of both ICF and UCF prevent Whitmore from demanding the value of his shares.

<u>AFFIRMED IN PART, REVERSED IN PART,</u>
<u>AND REMANDED</u>

13