## UNITED ELECTRIC SUPPLY COMPANY *v.* GREEN-CASTLE GARDENS SECTION III LIMITED PARTNERSHIP

[No. 855, September Term, 1976.]

*Decided May 13, 1977.*

The cause was argued before THOMPSON, MENCHINE and LOWE, JJ.

*Thomas L. Craven,* with whom were *Lynott & Craven, P.A.* on the brief, for appellant.

*Roy I. Niedermayer,* with whom was *Cathy A. Simon-Rose* on the brief, for appellee.

LOWE, J., delivered the opinion of the Court.

### Lochinvar's Web [1]

Interlocking close corporate control often provides singular benefits, including the diffusion of legal and contractual responsibility. For whatever reason they were originally spun, fair or foul, the convoluted ownership arrangements of the parties in this case prepared the path followed by the chancellor below. The webs became so entangled that, like Arachne's, they ultimately ensnared their creators.

Appellee Greencastle Gardens Section III Limited Partnership (Greencastle) employed Della Ratta, Inc. (Della Ratta) as general contractor to construct an apartment project. Joseph M. Della Ratta, the president of Della Ratta, Inc., is also one of the general partners in Greencastle. In his capacity as the former, he subcontracted the electrical work in the apartment project to Bruno's Electrical Contractors, Inc. (Bruno's). The project was to be constructed in Montgomery County, and there was in force at the time a

---

1. See *Marmion* (*Lochinvar*, Canto VI, Stanza 14) — Sir Walter Scott.

provision of the county code that, before any electric work could be done there, the electric contractor be licensed:

"(a) It shall be unlawful for any person, firm, company, corporation or partnership engaged in business as an electrical contractor to install, repair or maintain any electrical circuit, electrical equipment or electrical apparatus unless such person, firm, company, corporation or partnership shall have first been granted by the county, a business license, entitling the licensee to perform such work." Mont. Co. Code, Ch. 17, § 17-19 (a).

Bruno's was not a licensed electrical contractor in Montgomery County, nor, incidentally, did it have in its employ a master electrician, which is a further requirement of the Montgomery County Code:

"(b) All installations, repairs, maintenance or other work done under a business license issued pursuant to this chapter shall be by, or under the ultimate supervision of the master electrician or master electrician limited regularly employed by said licensee and designated on such business license as responsible for the work performed thereunder whose active status in accordance with section 17-24 has been certified by the board. For the purpose of this subsection, the words, 'regularly employed' shall mean that the master electrician or the master electrician limited shall be available to supervise the installation whenever such work is being performed by any electrician under his supervision for whose work he is responsible. Non-availability on the job for more than a two hour period of any master electrician, or master electrician limited, to supervise the performance of any electrical work performed under the authority of an electrical permit issued to him, shall be cause for the suspension or revocation of his license." Mont. Co. Code, Ch. 17, § 17-19 (b).

When Mr. Della Ratta sought assurance from the president of Bruno's, Mr. Bruno Tarabocchia, that he could handle the job, the licensing obstacle was disclosed:

> "A It was a very brief conversation, and Mr. Della Ratta asked me, he said, 'Bruno, can you handle the job?'
> Q What was your response?
> A 'Yes, Joe. I can handle the job. Just I don't have the license.', and he said —"

Mr. Della Ratta's further inquiry prompted Mr. Tarabocchia's suggestion of what appeared to be an acceptable solution:

> " . . . So he asked me who is supplying the license. . . . I told him Joe Penovich was supplying me with the license."

"Joe Penovich" is the president and owner of Redwood Electric Company (Redwood), which company is licensed to do electrical work under Montgomery County Code § 17-19 (a). It was thus able to obtain the necessary electrical work permit and, in order to comply with subsection (b), Mr. Penovich agreed to "supervise" since he also had a master electrician's license. But the agreement was not without a motivating thread tying together some of these webs. All of the electrical equipment purchased for the project was to be bought from United Electric Supply Company (United). Perhaps not coincidentally, Joe Penovich was also the owner and president of United. There was evidence to show that for Redwood's "quid", United would receive the material business as its "quo". Although Penovich equivocated on whether his securing of the permit was contingent upon Bruno's purchases from United, Mr. Tarabocchia did not:

> "Q Did you have any discussions with Mr. Penovich concerning your purchase of the equipment of United Electric insofar as that related to obtaining an electrical permit?

A Yes, we had.

Q What was that discussion?

A He said he will supply all the material and will do the supervision in the job, and he will put his permit, he will take out the permit.

Q Was it your understanding that unless you purchased all the equipment from him you would not get the electrical permit?

A Yes.

Q Was it your understanding you could not get the electrical permit, then buy your equipment elsewhere?

A No, the way we was talking, no, I had to buy the material from United Electric Supply.

Q You had to buy it from United Electric Supply?

A Yes, because he was doing the supervision and he was supplying the materials."

Presumably the webs could not support all of their arachnids, and problems arose concerning electrical equipment, installation acceptance by the power company, and conformity with the original plans. Equipment other than that called for by the plans was placed in the apartment project, and Greencastle failed to pay United for it.

The problems culminated in a hearing before the Circuit Court for Montgomery County on United's bill of complaint to enforce its mechanics' lien. The chancellor declined to enforce it and entered judgment on behalf of Greencastle. His opinion was convincingly reasoned, but it created, then vaulted, an obstacle the chancellor did not have to face.

The opinion commenced with the fundamental principle that an agreement in violation of a regulatory statute [2] is illegal and void, citing generally *Marburg v. Mercantile*

2. There is no contention but that the provisions at issue here are other than regulatory, and intended to protect the public.

*Bldg. Co.,* 154 Md. 438 and *Goldsmith v. Mfgrs' Liability I. Co.,* 132 Md. 283, and quoting from *Kirschner v. Klavik,* 186 A. 2d 227, 229, a District of Columbia Municipal Appeals case:

> "Generally, a contract made in violation of a Maryland statute designed for police or regulatory purposes is void and confers no rights upon the wrongdoer. Neither can the wrongdoer sue in quasi-contract for the value of his services or for the value of the benefits conferred upon the other party. This is true even where, as was shown here, the appellants entered into the contract with appellee knowing . . . ."

Building on this foundation, the chancellor pointed out that a mechanics' lien must be based upon an underlying contract, express or implied, between the contractor whom the materialman is supplying, and the owner. *Moreland v. Meade,* 162 Md. 95, 104-105; *Treusch and O'Connor v. Shryock & Clark,* 51 Md. 162. If the contract is an illegal one, reasoned the chancellor, the enforceability of the demand for payment connected with it depends upon " 'whether the plaintiff must resort to the illegal transaction to aid in establishing his case.' " *Van Meter v. Wilkinson,* 187 Md. 492, 499.

In order to apply that law, the chancellor was compelled to state his factual conclusions. He first found that:

> "There was no evidence of any direct contract between United Electric and Greencastle.";

and then reasoned:

> "Thus, United Electric is forced to rely upon the illegal contract between Bruno's and Greencastle to enforce its lien.[3] This, it cannot do; and if it cannot use that contract, what other contract is

---

3. United does not claim that this contract is not illegal.

available as a foundation for the enforcement of the lien? "

To further emphasize his point the chancellor pointed to *Snodgrass v. Immler*, 232 Md. 416 and *Harry Berenter, Inc. v. Berman*, 258 Md. 290.

In *Snodgrass*, a contract between a property owner and a licensed architect provided that an unlicensed architect would perform the actual services under the supervision of the licensee. The two architects then contracted that the unlicensed architect receive the lion's share of the fee. The Court noted that the contract between the owner and the licensed architect was valid standing alone, but that:

> " . . . when the facts surrounding this contract and its companion contract [were] examined, it [was] at once apparent that the contracts were a subterfuge employed in an attempt to circumvent the licensing statute." *Id.* at 422.

The unlicensed architect was denied relief against the licensed architect on his suit as a third party beneficiary of the owner-licensed architect contract.

In *Berenter*, the lienor sought enforcement of a mechanics' lien, although it was not licensed under the Maryland Home Improvement Law. The Court refused to enforce the lien, stating that:

> " . . . even though the mechanic's lien is created by statute, nevertheless, such a lien is provided for the *enforcement of a contract* for work done and materials furnished . . . ." *Id.* at 296.

The Court would not allow recovery for either material or work because it refused to aid a party in enforcing a contract to perform that which is forbidden by a regulatory statute. For the same reason, it would not permit *quantum meruit* recovery.

From these cases the chancellor concluded that:

> "If there is a common thread running through

Snodgrass, Thorpe [4], and Berenter, it is that those involved in an illegal contract will not be able to enforce that contract either directly (through the contract itself) or indirectly (e.g. mechanic's lien or third-party beneficiary)."

The chancellor than made his leap without constructing the necessary bridge, although he concluded his opinion in a commendable vein for a court of conscience:

"United Electric Supply Company would have this Court view the case as one where it, as materialman and separate legal entity, supplied materials which were incorporated into the building project and it should be paid since the violative transactions took place between other entities.

Sitting in equity, this Court would do an injustice to its name if it did not look through such a diaphanous veil. Mr. Penovich, as president of both Redwood Electric and United Electric, used Redwood's business license to secure a permit for Bruno's Electrical Contractors and used United Electric to supply materials to Bruno's. Mr. Penovich also provided his master electrician's license for the purpose of complying with the supervision requirements of the Montgomery County Code. (Montgomery County Code, Chapter 17, Section 17-19 (b) demands that the work done under the business license shall be under the ultimate supervision of the master electrician or master electrician limited regularly employed by the licensee. The Court questions the manner in which Mr. Penovich used his master electrician's

---

4. The court also relied upon Thorpe v. Carte, 252 Md. 523, but since recovery there was denied because a statute expressly precluded recovery, the language relied upon below was primarily dicta.

license, but finds no need to decide whether it violated the statute.)

The relationships in this case are too tainted and the entanglements too great for this Court to do anything but leave the parties where it finds them."

## Holding

The appellant raises the following two contentions upon appeal:

"1. THE VALIDITY OF A SUPPLIER'S MECHANIC'S LIEN CLAIM DOES NOT REST ON WHETHER OR NOT A SUBCONTRACTOR TO WHOM THE SUPPLIER SOLD MATERIALS CAN ENFORCE CLAIMS AGAINST THE OWNER OR GENERAL CONTRACTOR.

2. THERE IS NO ILLEGALITY CONNECTED WITH APPELLANT'S CLAIM OF A NATURE WHICH WOULD JUSTIFY A DENIAL OF RELIEF."

The chancellor apparently responded to the first issue with logic more appropriate to the second. As is apparent from his opinion, he felt that because the Greencastle — Bruno's contract was illegal, a bridge necessary to support United's claim against Greencastle was barred. It is not clear whether he felt that path would be barred even if United were not tainted by the Bruno's — Redwood contract. This latter contract he also found illegal, but only by implication. Inasmuch as it purported to do precisely what the Greencastle — Bruno's contract did, *viz.*, circumvent the prohibition against installing, repairing, or maintaining electrical circuits, equipment and apparatus without the requisite license, it plainly is illegal. No contention to the contrary is made on appeal.

Other than observing the contractual link from Greencastle through Bruno's to United, we need not and do not decide what effect, if any, the Greencastle — Bruno's

contract has on United. Rather, we view United's involvement with the Redwood — Bruno's contract as dispositive of United's claim against Greencastle. In doing so, we adopt the reasoning and recognize the authorities upon which the chancellor relied; but we do so without becoming ensnared in the parties' final web.

The gravamen of appellant's position is that its contract with Bruno's is wholly independent and distinct from Redwood's contract with Bruno's, and that United should not be tainted by the illegality of Redwood. Furthermore, it argues that even if the two contracts can be treated as one, each portion is severable, see *Baldwin, Etc. v. Grymes*, 232 Md. 470, 473, and the valid portion (*i.e.*, the portion to supply material) should be enforced. It stresses that at issue is United's claim for materials, not Redwood's claim for labor.

We first note the general rule that each corporation is an entity separate from its stockholders, *Ace Development Co. v. Harrison*, 196 Md. 357, even if its stock is owned solely by one person or another corporation. *Lopez v. Lopez*, 250 Md. 491, 503; *Quinn v. Quinn*, 11 Md. App. 638, 648. But that general rule — like most general rules — is subject to an exception:

> "When there is fraud, *or some other ground for its action, in furtherance of the ends of justice*, it is true that a court has the power to go behind the legal entity and treat the corporation and the owners of the capital stock and assets as identical." (emphasis added). *Steel Co. v. Concrete Pile Co.*, 141 Md. 67, 81.

See also *Md. Trust Co. v. Tulip Realty*, 220 Md. 399, 414.

Bruno's was obviously in violation of the statute by permitting its employees to perform electrical work without a business license. Redwood knowingly covered that illegality by using its business license as a shield to obtain a permit under which Bruno's perpetrated its statutory violation. And while a contract between Bruno's and United for material supplied would, *standing alone*, have been

perfectly legal as the chancellor observed, factually it relied upon the illegal contract between Bruno's and Penovich's Redwood, as so clearly shown by Mr. Tarabocchia's testimony quoted above and the record as a whole.

In light of these facts the corporate veils are indeed "diaphanous", as characterized by the chancellor, and are obscured by facts, which if not overtly fraudulent, smack thereof sufficiently to preclude United from recovery in an equity court by the doctrine of "clean hands". Having soiled one of his hands, Mr. Penovich cannot obscure the blemished one while supplicating with the other.

Mr. Penovich, who solely owned both corporations, would have us wink at the fact that the valid contract of one, was conditioned upon an illegal act of the other. Although justice is depicted with vision obscured, she can see through such a flimsy blindfold. Corporate veils were not intended to provide false fronts as conveyances for pecuniary gain made from conduct that is statutorily proscribed. In *Crocker v. Pitti*, 179 Md. 52, 58,[5]

> "The alleged chief actor in the fraud [was] asserted to have dominated and controlled intervening corporate entities and, through that domination and control, to have accomplished his personal ends and enterprises."

The Court of Appeals would have none of it and held that:

> "It [was] appropriate that equity should deal with him according to the verities and not to his simulations.",

noting that:

> "Where fraud exists, equity is equal to the occasion

---

5. But see Bart Arconti & Sons v. Ames-Ennis, 275 Md. 295, where the Court declined to pierce a corporate veil to proscribe its avoidance of a legal obligation, which took the form of a debt. However, in the instant case we do not pierce the veil for that purpose. Rather, we ignore the corporate guise only insofar as it is necessary to enforce the public policy of a regulatory statute.

no matter how fair and regular the disguise it may assume."

We need not decide if the conduct between Penovich (in the form of Redwood) and Bruno's was fraudulent. It is enough that it was in violation of a statute for an equity court to refuse to aid United's real party in interest — Penovich. In *Bayne v. Suit*, 1 Md. 80, 86, well over a century ago, the Court of Appeals said:

> "This court will not extend its aid to a party, who bases his cause of action upon an immoral or illegal transaction. If it should appear to the court, that the cause of action arose directly or indirectly, *ex turpi causa*, or in violation of any positive statute, in either case the court will withhold from the plaintiff all aid or assistance."

But we hasten to add, in light of the facts here:

> "The court's refusal is not for the sake of the defendant, but because it will not aid such a plaintiff." 2 Restatement *Contracts* § 598; *Thorpe v. Carte, supra*, 252 Md. at 529.

We, therefore, affirm the chancellor who would not permit his court to be used for rewarding such conduct.

*Judgment affirmed.*
*Costs to be paid by appellant.*