39 A.3d 131

Vincent Salvatore SERIO

v.

BAYSTATE PROPERTIES, LLC.

No. 1441, Sept. Term, 2009.

Court of Special Appeals of Maryland.

March 8, 2012.

582

**584**

⚖—3615

Robert Schulte (Schulte Booth, on the brief) Baltimore, MD, for appellant.

Leonard C. Redmond, III, Baltimore, MD, for appellee.

Panel: MATRICCIANI, GRAEFF, JAMES A. KENNEY, III (Retired, Specially Assigned), JJ.

KENNEY, J.

On October 29, 2007, Baystate Properties, LLC ("Baystate"), appellee, filed a complaint in the Circuit Court for

Baltimore County against Vincent Serio, appellant, who is the sole member of Serio Investments, LLC ("Serio Investments"). Baystate sought to hold Serio personally liable for amounts due to Baystate under a contract with Serio Investments. Serio engaged Shanell Harleston as counsel for the litigation, but about eight weeks before the trial date, Harleston notified him of her intent to withdraw as his attorney, which Serio opposed. On July 22, 2009, prior to beginning a bench trial, the circuit court granted Harleston's motion to withdraw as Serio's counsel and denied Serio's subsequent request for a brief continuance. At the end of the trial, the circuit court entered judgment in favor of Baystate against Serio personally in the amounts of $131,438.34 and $10,380.00.

Serio presents the following questions for our review, which we have slightly reworded:

1. Did the circuit court abuse its discretion by granting appellant's trial counsel's motion to withdraw as counsel on the day of trial and then denying appellant's request for a brief continuance to secure new trial counsel?

2. Did the circuit court err by finding Serio personally liable for the debts of Serio Investments, a limited liability company solely owned by Serio, absent a finding of fraud?

3. Did the circuit court err by not enforcing an express waiver of personal liability, executed by and between Baystate and Serio Investments?

For the following reasons, we shall reverse the judgment of the circuit court.

## FACTS AND PROCEEDINGS

On December 14, 2006, Timothy Wenzel, Managing Member of Baystate, entered into a contract (the "Agreement") with Serio, as Managing Member of Serio Investments, to build houses to certain specifications on two lots identified as 1901 and 1903 Hillside Drive (the "Hillside Drive Lots"), which were owned by Serio individually. Serio Investments, identified in the Agreement as "Lender," was to "provide an escrow account . . . from which [Baystate] will receive payments

according to the agreed upon draw schedule" for its work. Upon the sale of the improved lots to a third party, Baystate would be paid an additional $25,000 for each house.

As work progressed, Wenzel drafted multiple addenda to the Agreement representing changes to the work requested that, in aggregate, obligated Serio Investments to pay Baystate an additional $43,638.33. Each addendum, when first presented by Wenzel, referenced Serio personally, but Serio revised those references and both parties signed the addenda, with Serio signing as the Managing Member of Serio Investments. In June of 2007, Serio presented Wenzel with a handwritten waiver by Baystate and Serio Investments of any claims for personal liability under the Agreement. Wenzel typed that document and both Wenzel and Serio, on behalf of Baystate and Serio Investments respectively, executed the document.

Shortly thereafter, payments to Baystate began to slow. When Wenzel contacted Serio regarding the payments, he was assured that the properties would soon be sold. In fact, the 1901 Hillside Drive Lot had sold on June 29, 2007 for $380,000.00. The 1903 Hillside Drive Lot was sold on October 11, 2007, but, because the buyers subsequently defaulted on a mortgage, Serio received only approximately $20,000.00 on the sale. According to Baystate, none of the proceeds from the sale of the Hillside Drive Lots were deposited into the Serio Investments account.

On October 29, 2007, Baystate filed a complaint against Serio and Serio Investments in the Circuit Court for Baltimore County (Case No.: 03–C–07–012440) (the "Finished Houses case") for money owed on the Hillside Drive Lots, and an action in the District Court for Baltimore County (Case No.: 03–C–08–3835) (the "Empty Lot case") to recover for work done on an unimproved lot adjacent to the Hillside Drive Lots. Incidentally, two of Baystate's subcontractors filed actions against Baystate in the District Court to recover for work done on the finished houses. Baystate moved to have *Builder Services, Inc. v. Baystate Properties, LLC* (Case No.:

080400420382007) and *Harford Insulation v. Baystate Properties, LLC* (Case No.: 080400372032007) (the "Subcontractor cases") removed to the circuit court and consolidated with the Finished Houses case. On March 4, 2009, the court granted a Joint Motion to Consolidate the Finished Houses and Empty Lot Cases and set the Finished Houses case along with Empty Lot case and Subcontractors Cases in for trial on July 22, 2009. On July 21, 2009, Serio Investments, LLC filed for bankruptcy under Chapter 7, staying all creditor actions against the LLC.

Serio engaged Shanell Harleston and the Harleston Law Firm, LLC, to represent both Serio and Serio Investments in the litigation. On May 12, 2009, Harleston contacted Serio by letter to inform him that her recent employment with the federal government necessitated the closing of her private practice, and of her intent to withdraw as his attorney in the Baystate litigation. Subsequently, Harleston filed, under Maryland Rule 2–132, a Motion to Withdraw Appearance as Counsel in the Circuit Court for Baltimore County. Because the clerk's office did not correctly docket that motion, it was not ruled on until the day of the trial.

Prior to the beginning of the trial, the circuit court considered Harleston's motion to withdraw and Serio's opposition to that motion. The court concluded that Harleston had fulfilled her obligations to Serio and granted her request to withdraw as counsel. Serio then asked the court for a brief continuance, but the court, finding that Serio was long aware of his need to secure substitute counsel, denied the request. In the court's view, Serio's failure to act until the week of trial was unreasonable, and he would have to proceed *pro se.* Both parties waived their right to a jury trial, and at the conclusion of the bench trial, the court did not find fraud but, to enforce a paramount equity, held Serio personally liable for the obligations of Serio Investments. The court entered judgment on July 29, 2009, in favor of Baystate and against Serio individually in the amounts of $131,438.34 for the Finished Houses case and $10,380.00 for the Empty Lot case, exclusive of costs. This timely appeal followed.

## DISCUSSION

In this case, we are asked to consider: (1) whether the circuit court abused its discretion in permitting Serio's counsel to withdraw on the day of the trial without allowing Serio a brief continuance to secure new counsel and, if not, (2) whether the personal liability shield accorded to limit liability companies should have been disregarded and Serio held personally liable for the monies owed to Baystate by Serio Investments' obligations. Recognizing the deference we owe to the circuit court's factual determinations, we will discuss these issues in turn.

### Counsel's Withdrawal

Serio contends (1) that Harleston's withdrawal violated her ethical duties under the Maryland Rules of Professional Conduct; (2) that the circuit court's denial of his request for a continuance effectively denied him "a meaningful opportunity to secure new counsel *after* the Court grants an attorney's request to withdraw" as his counsel; and (3) the clerk's subsequent notification under Rule 2–132, six days after judgment was entered, rendered the Rule "meaningless."

Rule 2–132 governs the striking of an attorney's appearance and imposes notification obligations on the moving attorney and clerk of the court. It states, in pertinent part:

**(b) By motion.** When the client has no other attorney of record, an attorney wishing to withdraw an appearance shall file a motion to withdraw. Except when the motion is made in open court, the motion shall be accompanied by the client's written consent to the withdrawal or the moving attorney's certificate that notice has been mailed to the client at least five days prior to the filing of the motion, informing the client of the attorney's intention to move for withdrawal and advising the client to have another attorney enter an appearance or to notify the clerk in writing of the client's intent to proceed in proper person.... *The court may deny the motion if withdrawal of the appearance would cause undue delay, prejudice, or injustice.*

**(c) Notice to employ new attorney.** *When the appearance of the moving attorney is stricken* and the client has no attorney of record and has not mailed written notification to the clerk of an intention to proceed in proper person, the clerk shall mail a notice to the client's last known address warning that if new counsel has not entered an appearance within 15 days after service of the notice, the absence of counsel will not be grounds for a continuance. The notice shall also warn the client of the risks of dismissal, judgment by default, and assessment of court costs.

(Emphasis added). Rule 2–508(a), which addresses the court's ability generally to continue a trial or proceeding, states:

n motion of any party or on its own initiative, *the court may continue* a trial or other proceeding *as justice may require.*

(Emphasis added).

The Maryland Rules of Professional Conduct ("MRPC") establish the ethical duties and obligations of a Maryland attorney. *See e.g., Atty. Griev. Comm'n v. Bleecker,* 414 Md. 147, 994 A.2d 928 (2010). MRPC Rule 1.16 governs an attorney's termination of representation and states, in relevant part:

(c) A lawyer must comply with applicable law requiring notice to or permission of a tribunal when terminating representation. When ordered to do so by a tribunal, a lawyer shall continue representation notwithstanding good cause for terminating representation.

(d) Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interest, such as giving reasonable notice to client, allowing time for employment of other counsel, surrendering papers and property to which client is entitled . . . .

According to a Comment to MRPC Rule 1.16(c), an attorney should not represent a client in a matter that the attorney cannot perform to completion and has the option to withdraw if withdrawal can be completed without material adverse effect to the client's interests.

To grant or deny a motion to withdraw as counsel or a motion for continuance is "in the sound discretion of the trial court." *Das v. Das,* 133 Md.App. 1, 31, 754 A.2d 441 (2000) (quoting *Thanos v. Mitchell,* 220 Md. 389, 392, 152 A.2d 833 (1959)). We review the trial court's decision for an abuse of discretion and "unless [the] court acts arbitrarily in the exercise of that discretion, [its] action will not be reviewed on appeal." *Id.* at 26, 754 A.2d 441. We will reverse the circuit court only in "exceptional instances where there was prejudicial error." *Thanos,* 220 Md. at 392, 152 A.2d 833. *See also Das,* 133 Md.App. at 26, 754 A.2d 441. An abuse of discretion occurs "where no reasonable person would take the view adopted by the court" or if the court acts "without reference to any guiding rules or principles." *North v. North,* 102 Md.App. 1, 13, 648 A.2d 1025 (1994).

Harleston complied with the procedural requirements of the Maryland Rules in terminating her representation. To effectuate a withdrawal as counsel, an attorney must mail notice to the client, "informing the client of the attorney's intention to move for withdrawal and advising the client to have another attorney enter an appearance[.]" Rule 2–132(b). On May 12, 2009, she mailed a letter to Serio informing him that her employment with the federal government would necessitate closing her private practice and withdrawing as counsel.[1] She advised Serio to secure alternate counsel. This letter triggered the five-day notice period required "prior to the filing of the motion [to withdraw.]" *Id.* The motion to withdraw as counsel along with a copy of the letter to Serio and a certificate of service indicating that Serio was provided written notice of Harleston's intent to withdraw was filed with the circuit court on June 9, 2009, over a month after Serio had first been notified of Harleston's intent to withdraw.

---

**1.** Prior to the May 12, 2009 letter, Serio filed a grievance against Harleston after she had orally informed Serio in April of her intent to withdraw as counsel. Harleston testified that the Attorney Grievance Commission had dismissed the complaint because her withdrawal was considered appropriate.

Serio argues that the circuit court abused its discretion because "the *raison d'etre,* and common sense import of subsection (c) of Rule 2–132, is to ensure that a litigant is given a meaningful opportunity to secure new counsel *after* the Court grants an attorney's request to withdraw their representation." (Emphasis in original). In his view, a "meaningful opportunity" would be at least 15 days because the clerk's warning under subsection (c) provides a 15–day window for entry of an appearance by new counsel. Serio cites *Renshaw v. State,* 25 Md.App. 270, 333 A.2d 363 (1975) and *Johnson v. State,* 274 Md. 29, 333 A.2d 37 (1975), for the proposition that "[t]he meaning of the Rule depends upon 'the reasonable intendment of the language used in light of the purpose to be effectuated[.]'" *Johnson,* 274 Md. at 41, 333 A.2d 37 (quoting *Brown v. State,* 237 Md. 492, 504, 207 A.2d 103 (1965)). Both of these cases concern an indigent defendant's right to counsel in a criminal trial.

Rule 2–132(c) does require the clerk, *after* an attorney's appearance is stricken, to notify a litigant for whom there is no attorney of record that, if no counsel's appearance has been entered in 15 days, the absence of counsel will not be grounds for a continuance. And, except in the case of a "motion . . . made in open court," Rule 2–132(b) requires that a motion to withdraw not be filed for "at least five days" after the mailing to the client of the intention to withdraw, but the Rule does not preclude the filing of a motion to withdraw within five days of trial. Thus, we are not persuaded that the Rule mandates a 15–day continuance after an attorney's appearance is stricken to permit a client without an attorney of record to secure new counsel. Instead, it permits denial of a motion for withdrawal, whenever filed, if withdrawal would cause "undue delay, prejudice, or injustice." This is consistent with Rule 2–508(a), which provides that a "court *may* continue a trial . . . as justice may require." (Emphasis added). Although subsection (c) does not expressly address what happens when a motion to withdraw is not ruled on until the day of trial, it appears that the granting or denial of both the motion to withdraw and a request for a continuance is in the

discretion of the court, and that discretion is to be exercised in light of the circumstances.

This Court, in *Das, supra,* found that a client who did not act to secure substitute counsel following notification of an attorney's intent to withdraw is not entitled to a continuance. In that case, a wife initiated an action for absolute divorce against her husband. The attorney, engaged by the husband, later notified the husband of "her impending withdrawal by letter" and "advis[ed] him to 'immediately obtain alternative counsel and have them enter their appearance.' " 133 Md.App. at 24, 754 A.2d 441. The husband did not respond to the attorney's letter, and after waiting "considerably more than five days," the attorney filed her motion to withdraw as counsel. *Id.* at 24–25, 754 A.2d 441. The circuit court granted the motion on June 3 and the trial commenced on August 11. When the husband later moved to vacate the entry of default in the divorce action, in which he argued the circuit court acted improperly in granting his attorney's withdrawal, we held that the husband had "slept on his rights and lost the opportunity to protest [his attorney's] withdrawal." *Id.* at 25, 754 A.2d 441. We said the husband's argument, "that he lacked the notice he needed to retain new counsel[,] strains credibility," and the need to employ new counsel came as "no surprise" because of the attorney's letter and the Court's Notice to Employ New Counsel. *Id.* at 26, 754 A.2d 441. Moreover, and as the husband admitted in his testimony, he "expect[ed] to be represented by new counsel in this case." *Id.*

While *Das* addressed a situation where notice to employ new counsel was issued by the clerk of the court approximately 60 days before trial, the Court's reasoning provides some guidance in this case. Serio was notified on February 5, 2009, that the trial date for this case was set for July 22, 2009. On May 1, 2009, Harleston issued an announcement to her clients, including Serio, that she was closing her office. She followed up the announcement with a Rule 2–132 letter to Serio on May 12, 2009, in which she stated her need to withdraw because her employment with the federal govern-

ment prevented her from seeing the litigation to its conclusion, and her health issues undermined her ability to effectively carry out the representation.[2] According to Serio, he attempted to follow up and file an opposition to that motion before the trial date, but did not do so because, as a result of improper docketing, the court did not show the motion as having been filed. But, by Serio's own admissions, he was aware of the trial date and fully understood Harleston's intent to withdraw. In fact, he testified that it was "clear that [Harleston] had no intention of coming [to trial]." Yet, aware of his need to secure counsel and the approaching trial date, Serio did not seek to engage counsel until shortly before trial.[3] The circuit court concluded:

> I do not find it reasonable that Mr. Serio waited until apparently just recently to contact another lawyer. He's had all of May, all of June and three weeks in July to have another lawyer get involved in this matter.

The circuit court found that Harleston had met the requirements imposed by Rule 2–132(b) and that Serio had had

---

**2.** At trial, Serio argued that Harleston did not return all materials relevant to the Baystate litigation as required despite his efforts to obtain the information. Harleston testified that she attempted to organize many deliveries, which Serio repeatedly cancelled, but ultimately, her husband had delivered all materials belonging to Serio albeit under protest by Serio. The trial court made no express finding on whether Serio was provided all papers relevant to the Baystate litigation, but on appeal, Serio does not argue that the Baystate materials were not timely delivered.

**3.** Serio brought another attorney, who he had contacted only "a few days" before trial, to address the court at the hearing. That attorney did not enter his appearance, however, because he was not prepared to handle Serio's case. He informed the circuit court that were he to enter his appearance it would "be tantamount to malpractice" because he "knew nothing about it." Harleston testified that Serio informed her on the trial date that he had another attorney, presumably that attorney, who was willing to take the case but he needed a postponement to prepare. Nothing in the record addresses whether the attorney was willing to enter his appearance and represent Serio if the circuit court granted a continuance and how long a continuance would be necessary. The attorney did state that he had attempted to contact Harleston, but without success.

adequate time to secure a substitute attorney but he failed to do so. In the court's view, it was not "reasonable that Mr. Serio waited until apparently just recently to contact another lawyer. Therefore, to the extent that there might be prejudice to Mr. Serio by proceeding pro se . . . it's his own fault." Under these circumstances, we are not persuaded that the circuit court's grant of Harleston's motion to withdraw and the denial of Serio's request for a continuance constituted an abuse of discretion.[4]

### *Piercing the Veil of the Limited Liability Company*

Serio's second contention is that the circuit court erred in piercing the personal liability shield provided by a limited liability company in the absence of a finding of fraud. He argues, "[c]ourts should be very reluctant, and have been reluctant to set aside these [limited liability] entities to achieve some rough notion of fairness absent conduct amounting to fraud." In appellant's view, the "underlying claim [is] nothing more than a simple breach of contract claim between two (2) Maryland limited liability companies," and while the breach may be unfortunate, it is not a basis to hold him personally liable for Serio Investments' obligations.

Section 4A–301 of the Corporations and Associations Article states, "[e]xcept as otherwise provided by this title, no member shall be personally liable for the obligations of the limited liability company, whether arising in contract, tort or otherwise, solely by reason of being a member of the limited liability company." Our case law has recognized the availability of an action to disregard a limited liability entity congruent

---

4. Before deciding to proceed with the bench trial, the trial court inquired regarding the length of time necessary to hear the consolidated cases. Baystate's counsel indicated that the claim filed by one of the subcontractors, Harford Insulation, had been dismissed and, therefore, there were "two cases that ha[d] to be heard." All parties, with the exception of Serio, were prepared to proceed. After determining the case would take approximately 90 minutes to try and both Baystate and Serio were willing to waive a jury trial, the court then heard Harleston's motion to withdraw and afterward proceeded with the bench trial.

with the equitable remedy of piercing the corporate veil. *See McCleary v. McCleary,* 150 Md.App. 448, 458, 822 A.2d 460 (2002) (reversing the circuit court for improperly "pierc[ing] the LLC's veil of limited liability" and classifying an entity's asset as a marital asset of the sole member for the purposes of determining a marital property award based upon the appellant's sole membership interest in the LLC). *See also* Paul Lieberman, *West's Legal Forms: BUSINESS ORGANIZATIONS with Tax Analysis,* § 1.8 (3rd ed.2000), which states:

> In any case in which a party seeks to hold the members of a limited liability company personally responsible for the alleged improper actions of the limited liability company (cf. their own actions), case law which interprets the conditions and circumstances under which stockholders of a corporation are held liable is to be applied, including laws regarding piercing the corporate veil of a corporation. . . .

> In any case, members of the limited liability company are not personally liable under a judgment, decree, or order of a court, or in any other manner, for a debt, obligation, or liability of the limited liability company.

In this opinion, we look to case law discussing piercing a corporate veil for instruction.

According to the Court of Appeals in *Bart Arconti & Sons, Inc. v. Ames–Ennis, Inc.,* 275 Md. 295, 340 A.2d 225 (1975):

> [T]he most frequently enunciated rule in Maryland is that although the courts will, in a proper case, disregard the corporate entity and deal with substance rather than form, as though a corporation did not exist, shareholders generally are not held individually liable for debts or obligations of a corporation except where it is necessary to prevent fraud or enforce a paramount equity.

*Id.* at 310, 340 A.2d 225 (citations omitted). This standard has been so narrowly construed that neither this Court nor the Court of Appeals has ultimately "found an equitable interest more important than the state's interest in limited shareholder

liability." [5] *Residential Warranty v. Bancroft Homes Greenspring Valley, Inc.,* 126 Md.App. 294, 307 n. 13, 728 A.2d 783 (1999) (quoting G. Michael Epperson & Joan M. Canny, *The Capital Shareholder's Ultimate Calamity: Pierced Corporate Veils and Shareholder Liability in the District of Columbia, Maryland, and Virginia,* 37 Cath. U.L.Rev. 605, 621 (1988)). *See also id.* at 309, 728 A.2d 783 ("Maryland is more restrictive than other jurisdictions in allowing a plaintiff to pierce a corporation's veil.").

Piercing the corporate veil is an equitable action. *Hildreth v. Tidewater,* 378 Md. 724, 735, 838 A.2d 1204 (2003). In our review, findings of fact decided by the trial court will be upheld unless clearly erroneous, but "the trial court's balancing of the equities [is reviewed] for an abuse of discretion." *Royal Investment Group, LLC v. Wang,* 183 Md.App. 406, 440, 961 A.2d 665 (2008).

According to the trial court, the evidence did not support a finding of fraud, but it was "sufficient to establish a paramount equity" and "that there would be an inequitable result involving fundamental fairness" if the "corporate veil" was not pierced. In reviewing that finding, the court considered the following: (1) Serio individually owned the Hillside Drive lots and conveyed them individually; (2) Serio gave assurances to Wenzel regarding settlement of the lots; (3) Serio lied to Wenzel about the sale and settlement of the first lot; (4) Serio Investments had significant debt and possessed no income besides Serio's personal deposits, making Serio Investments "virtually insolvent;" and (5) an escrow account was never established as provided for in the Agreement for Baystate to draw funds upon, despite statements by Serio that an escrow account would be created.

Many Maryland cases have addressed fraudulent activity justifying disregarding the corporate entity, *see Antigua Con-*

---

5. There are opinions from this Court affirming a trial court's decision to pierce the corporate veil to enforce a paramount equity, but the Court of Appeals has reversed those decisions. *See, e.g., Hildreth,* 378 Md. 724, 838 A.2d 1204.

*dominium Ass'n v. Melba Investors Atlantic, Inc.*, 65 Md.App. 726, 501 A.2d 1359 (1986), *judgment vacated on other grounds*, 307 Md. 700, 517 A.2d 75 (1986); *Fuller v. Horvath*, 42 Md.App. 671, 402 A.2d 134 (1979); *Damazo v. Wahby*, 259 Md. 627, 270 A.2d 814 (1970), and treating the corporation and its owners as one to further the ends of justice. *United Electric Supply Co. v. Greencastle Gardens Ltd. P'ship*, 36 Md.App. 70, 79, 373 A.2d 42 (1977). *See also Maryland Trust Co. v. Tulip Realty Co.*, 220 Md. 399, 414, 153 A.2d 275 (1959). But, few decisions have explicated or applied the concept of enforcing a "paramount equity" even though the often-repeated rhetoric suggests it as a basis to disregard the entity distinct from fraud. *Travel Committee, Inc. v. Pan American World Airways, Inc.*, 91 Md.App. 123, 603 A.2d 1301 (1992), *cert. denied*, 327 Md. 525, 610 A.2d 797 (1992). As this Court has stated:

> Despite the proclamation that a court may pierce the corporate veil to enforce a paramount equity, arguments that have urged a piercing of the veil "for reasons other than fraud" have failed in Maryland courts. This Court observed that, "notwithstanding its hint that enforcing a paramount equity might suffice as a reason for piercing the corporate veil, the Court of Appeals to date has not elaborated upon the meaning of this phrase or applied it in any case of which we are aware." [Internal citations omitted].

*Residential Warranty v. Bancroft Homes Greenspring Valley, Inc.*, 126 Md.App. 294, 307, 728 A.2d 783 (1999). *See also Ramlall v. MobilePro Corp.*, 202 Md.App. 20, 31, 30 A.3d 1003 (2011) ("With no precedent approving this extraordinary remedy, we decline to pierce the corporate veil [ ] based on the paramount equity justification.").

Even Maryland decisions that recognize alternate grounds for piercing the corporate veil have not done so absent a finding of fraud. *See, e.g., Travel Committee*, 91 Md.App. at 159, 603 A.2d 1301 (finding no evidence of fraud and that evidence of siphoning of corporate funds was conflicting, there was no justification to pierce the corporate veil); *Colandrea v. Colandrea*, 42 Md.App. 421, 401 A.2d 480 (1979) (pierced the

corporate veil because the record contained evidence of fraud); *Quinn v. Quinn,* 11 Md.App. 638, 649, 276 A.2d 425 (1971) (finding no grounds to pierce the corporate veil because no evidence of fraud).

Despite the *Hildreth v. Tidewater* Court's decision not to pierce the corporate veil, Baystate asserts that the opinion, in that case, articulates circumstances establishing a "paramount equity" that would warrant disregarding the entity shield. In *Hildreth,* the trial court found Hildreth, who was the sole shareholder, director and officer of HCE, Inc. ("HCE"), a New Jersey corporation, personally liable for contracts entered into by HCE. HCE was formed in November 1996 and, some time later, began to do business in Maryland, without registering as a foreign corporation as required by Maryland law. The trial court based its decision on the notion of enforcing a paramount equity and we affirmed. It found a combination of circumstances that established a "paramount equity": (1) Hildreth was the sole shareholder; (2) Hildreth was "personally involved" in the transactions at issue; (3) there was evidence of bad faith; (4) business conducted by HCE was illegal because the corporation was not registered in Maryland; (5) Maryland law precludes an unregistered foreign corporation from engaging in business in Maryland; and (6) there was evidence of a conscious evasion of responsibility. 378 Md. 724, 733–34, 838 A.2d 1204 (2003).

The Court of Appeals reversed, stating:

> [I]t is abundantly clear from our actual holdings in cases where attempts were made to pierce a corporate veil—to hold stockholders personally liable for corporate obligations—that those circumstances, individually or in combination, do not suffice.

*Id.* at 734, 838 A.2d 1204. The Court, in its opinion, acknowledged prior "favorable references" to the "synthesis" of "when a corporate entity will be disregarded" in the 1953 edition of Brune, MARYLAND CORPORATION LAW AND PRACTICE, which, in § 371, provides:

First. Where the corporation is used as a *mere shield for the perpetration of a fraud*, the courts will disregard the fiction of separate corporate entity.

Second. The courts may consider a corporation as unencumbered by the fiction of corporate entity and deal with substance rather than form as though the corporation did not exist, in order *to prevent evasion of legal obligations.*

Third. Where the stockholders themselves, or a parent corporation owning the stock of a subsidiary corporation, *fail to observe the corporate entity*, operating the business or dealing with the corporation's property as if it were their own, the courts will also disregard the corporate entity for the protection of third persons.

*Id.* (emphasis added). While the first ground addresses fraud, the second and third grounds are, in the Court's view, "subsumed [ ] in the doctrine of paramount equity." *Id.* at 739, 838 A.2d 1204.

■■■ As to the third ground, sometimes referred to as the "alter ego" doctrine, *id.* at 736, 838 A.2d 1204, the Court indicated that "with great caution" and only "in exceptional circumstances" could a corporate entity be disregarded if the plaintiff shows:

(1) "[C]omplete domination, not only of the finances, but of policy and business practice in respect to the transaction so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own," (2) that "such control [was] used by the defendant to commit fraud or wrong, to perpetrate the violation of the statutory or other positive legal duty, or dishonest and unjust act in contravention of the plaintiff's legal rights" and (3) that such "control and breach of duty proximately caused injury or unjust loss."

*Id.* at 735, 838 A.2d 1204 (quoting 1 William Meade Fletcher, FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS, Sec. 41.10 at 583–86 (1999 Rev. Vol.)). Factors to be considered include whether the corporation was adequately capitalized, the company's solvency when entering the transaction,

the observance of corporate formalities and evidence that the corporation "had no separate mind, will or existence of its own." *Id.* at 736, 838 A.2d 1204. The *Hildreth* Court found no support in the record to justify holding the shareholder personally liable for the corporate obligation, stating:

> What the record does show is that HCE–NJ [Hildreth's corporation] was a valid, subsisting corporation which, until it suffered a reversal of fortunes, had substantial assets and business prospects ... [T]here is no evidence that [Hildreth's] conduct in any way influenced Tidewater to enter into the contractual arrangement from which this debt arose. Tidewater knew that it was dealing with a corporation, and it had satisfied itself that the corporation had substantial contracts and assets, that it had two business locations in the State, that it had numerous employees and that it was not a "one man show."

*Id.* at 737, 838 A.2d 1204.

The Court next addressed whether Hildreth's conduct was for the purpose of evading a legal obligation, the second ground of the Brune synthesis. The Court began by stating that Maryland case law is a "testament to the narrowness" of the evasion of a legal obligation ground. *Id.* at 738, 838 A.2d 1204. Reviewing the holding in *Bart Arconti & Sons, Inc. v. Ames–Ennis, Inc.*, 275 Md. 295, 340 A.2d 225 (1975), the *Hildreth* Court reflected on its refusal to pierce the corporate veil in a situation where the stockholders' conduct was "clearly designed to cause the corporation to evade a legal obligation" and rendered the corporation "all but insolvent." *Id.* at 738–39, 838 A.2d 1204 (citing *Bart Arconti*, 275 Md. at 305, 340 A.2d 225). The Court concluded that if the conduct (or misconduct) found in *Bart Arconti* did not warrant holding the shareholder personally liable, the conduct in *Hildreth* did not do so either. *Id.* at 739, 838 A.2d 1204.

This Court addressed the "alter ego" doctrine in *Residential Warranty v. Bancroft Homes Greenspring Valley, Inc.*, 126 Md.App. 294, 728 A.2d 783 (1999). Rubenstein was the sole owner and shareholder of BHI, Inc. ("BHI"). The Resi-

dential Warranty Corporation ("RWC") entered into an agreement with BHI to construct homes for The Club at McDonogh Township ("Club") in accordance with RWC's approved standards and the applicable building codes, to perform warranty repairs, and to indemnify RWC for costs in repairing structural defects during the first two years of warranty coverage. Construction loan proceeds related to the project had been deposited into a BHI account at Signet Bank. Rubenstein frequently moved funds from the BHI account at Signet Bank into his personal account with no business justification for those transfers and rendered BHI nearly insolvent. When the buildings were at various stages of completion, BHI became aware of serious structural problems that would require substantial cost and effort to remedy. The transfers continued despite concerns by the project superintendent and Club residents regarding BHI's finances and problems relating to the construction under the contract with RWC.

When RWC contacted Rubenstein regarding reports of problems with the buildings, Rubenstein assured RWC that all major problems had been resolved or were being actively worked on. Later, a report issued by a structural engineering firm revealed that the problems had actually been covered up and posed a serious and continuing threat. The Council of Unit Owners of the Club sued to hold RWC and BHI jointly and severally liable for the defects. That suit was ultimately settled with RWC paying $625,000 and BHI, along with the other defendants, paying $3,575,000. In a cross-claim, RWC sought to hold BHI and Rubenstein personally liable for fraudulent conveyance, concealment, and breach of contract. We held that there was no evidence of fraud and, without such evidence, there was no material dispute of fact to adjudicate in regard to piercing RWC's corporate veil. *See id.* at 311, 728 A.2d 783 (citing *Starfish Condominium Ass'n v. Yorkridge Serv. Corp., Inc.*, 295 Md. 693, 714–20, 458 A.2d 805 (1983)) ("Without factual evidence to link the distributions to fraudulent actions, appellant is unable to generate a genuine dispute of material fact."). *See also Turner v. Turner*, 147 Md.App. 350, 425, 809 A.2d 18 (2002) (citing *Ferguson Trenching Co. v.*

*Kiehne,* 329 Md. 169, 175, 618 A.2d 735 (1993)) ("[W]hen an official or agent signs a contract for his corporation it is simply a corporate act. It is not the personal act of the individual, and he is not personally liable for the corporate contract unless the matter is tainted by fraud....").

Even cases cited in the Brune synthesis to support the second and third grounds for disregarding the corporate entity reflect reluctance to disregard the corporate entity in a clear business-to-business transaction. For example, *Home News, Inc. v. Goodman,* 182 Md. 585, 593–94, 35 A.2d 442 (1944), purports to be authority for the proposition that failure to observe corporate formalities permits disregarding the corporate entity. But, as the *Bart Arconti* court pointed out, *Home News* "might superficially appear to be authority" for that proposition, but the contract in that case had originally been entered into by the corporation's principals as individuals, and the corporation was formed later. 275 Md. at 311, 340 A.2d 225. In that situation, the corporation was held jointly liable with the principals without the need to pierce the corporate veil.

 Moreover, the decisions of this Court and the Court of Appeals have made clear that the corporate veil will not be pierced to redress the breach of a contractual obligation in the absence of fraud when the party seeking to pierce the corporate shield has dealt with that corporation in the course of its business on a corporate basis. Referred to as corporate estoppel, and sometimes assimilated with the doctrine of incorporation de facto, such a course of conduct, particularly in a business-to-business context, precludes a request to pierce the corporate veil. *Turner,* 147 Md.App. at 426–28, 809 A.2d 18.

In *Hildreth v. Tidewater,* the Court found the plaintiff and "a valid, subsisting corporation entered into a commercial contract and [the aforementioned corporation] later became unable to satisfy its obligation under that contract. That is unfortunate, but it is not a basis for making someone else liable for the corporate debt." 378 Md. 724, 738–39, 838 A.2d 1204 (2003). In *Bart Arconti,* the Court refused to pierce the

corporate veil despite conduct the trial court described as clearly designed to evade a legal obligation and create corporate insolvency. 275 Md. at 295, 340 A.2d 225. Similarly, in *Travel Committee, Inc. v. Pan American World Airways, Inc.*, this Court did not pierce the corporate veil despite evidence that the stockholder siphoned funds from the corporation. 91 Md.App. 123, 159, 603 A.2d 1301 (1992). In sum, Maryland is averse to disregarding the entity shield in a business situation in the absence of fraud.

 In this case, the circuit court found that, while there was no evidence to support fraud, the circumstances warranted the enforcement of a paramount equity. In reaching that conclusion, the circumstances the court relied upon were that Serio personally owned and sold the two lots individually. Regarding financial solvency, the circuit court found that Serio Investments possessed no assets and very little cash. It noted that Serio Investments had significant debt and no income or deposits besides Serio's own personal checks, but that alone did not, in the circuit court's view, necessarily suggest a wrong. Rather, what the court appeared to find more troubling was that Serio had misled Baystate regarding the sale of the homes on the Hillside Drive Lots and that Serio Investments had agreed to establish an escrow account. In the circuit court's view, Serio's failure to deposit the funds from the sale of the Hillside Drive lots into Serio Investments, and the fact that Serio Investments later filed for Chapter 7 bankruptcy, evidenced an intent to evade the company's legal obligations to Baystate. The circuit court concluded that, based upon those circumstances, an inequitable result would occur if the entity status of Serio Investments was honored.

The evidence relied upon by the circuit court, at most, approaches the conduct at issue in *Bart Arconti*, where the Court refused to pierce the corporate veil and hold a shareholder personally liable for conduct that rendered its corporation all but insolvent and was "clearly designed to cause the corporation to evade a legal obligation." *See Bart Arconti*, 275 Md. at 305, 340 A.2d 225. Nor did this Court pierce the

corporate veil in a situation where a shareholder placed corporate funds into his personal account and lied regarding matters affecting public safety. *See Residential Warranty v. Bancroft Homes Greenspring Valley, Inc.*, 126 Md.App. 294, 307, 728 A.2d 783 (1999). We are not persuaded that the facts of this case establish such "exceptional circumstances" as to warrant a different conclusion. *See Hildreth,* 378 Md. at 736, 838 A.2d 1204.

Baystate, also a limited liability company, contracted with Serio Investments, a valid, subsisting limited liability company at the time of the transaction.[6] While Serio Investments might have been inadequately capitalized, often times possessing just around $100 in cash in its account, there is no evidence that Baystate entered into the Agreement depending on Serio to fund its contracts from his personal account or that Baystate took reasonable steps to assure the availability of adequate funding. Based on Wenzel's testimony, Baystate was aware that the lots were in Serio's name prior to entering the Agreement. Even though an escrow account that was provided for in the Agreement was not established, there was no evidence that Baystate ever challenged or questioned the failure to establish a funded escrow account.

Serio made it clear in the beginning that Serio Investments was Baystate's contractual partner for funding the project. The Agreement and each addendum continued to identify "Serio Investments" as Baystate's contractual partner and were signed by Serio as the "Managing Member." During their course of business, the parties also executed a document

---

6. Baystate argues that the testimony of Timothy Wenzel, the Managing Member of Baystate, demonstrates that it was unclear whether Serio or Serio Investments was the party to Baystate's contract. This argument is not persuasive. While the original written agreement as drafted by Baystate listed Serio personally, neither party signed nor adopted that contract. A later written agreement, prepared by Baystate and signed by both parties, identifies Serio, as the Managing Member of Serio Investments, LLC. The Agreement identifies the "BUILDER" as "Tim Wenzel" with "Baystate Properties, LLC" beneath his name and "Lender" is identified as "Serio Investments, LLC" and the signature line reads "By: Vincent S. Serio, managing member."

stating that Wenzel and Serio were not to be held liable for any obligations of their respective limited liability companies.[7] Serio Investments made payments to Baystate consistent with its obligations under the contract for six months. All payments made to Baystate under the contract were either with checks issued from Serio Investments' corporate account, signed by Serio as the "Managing Member," or with cashier checks funded by Serio Investments. Moreover, the transfers of money by Serio to Serio Investments were supported by Confessed Judgment Promissory Notes indicating the payments were loans and not a simple commingling of funds.

In sum, Serio Investments fulfilled the contract with Baystate until, as Serio testified, the collapse of the housing market caused problems. Baystate was an established building contractor who understood and agreed that it was doing business with another limited liability company, as reflected in the Agreement, later addenda, and their continuing course of business. Under these circumstances, we conclude that the circuit court abused its discretion in finding Serio personally liable for the obligations of Serio Investments.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY REVERSED.**

**COSTS TO BE PAID 50% BY APPELLANT AND 50% BY APPELLEE.**

---

7. The document entered into by and between Baystate and Serio Investments states:

Timothy P. Wenzel, personally, shall NOT be liable for any obligation of BAYSTATE PROPERTIES, LLC under this AGREEMENT, and that Vincent S. Serio, personally, shall NOT be liable for any obligation of SERIO INVESTMENTS, LLC under this AGREEMENT.

Serio contends that the terms of this document should be given effect, but for our purposes, it is further acknowledgment that Baystate clearly understood that it was dealing with a limited liability company throughout its business dealings and agreed to do so.